389 So.2d 1007 (1979)
Mark ROYER, Appellant,
v.
The STATE of Florida, Appellee.
No. 78-1050.
District Court of Appeal of Florida, Third District.
December 28, 1979.
On Rehearing September 9, 1980.
Rehearing Denied October 21, 1980.
Fine, Jacobson, Block, Goldberg & Semet and Theodore Klein, Miami, for appellant.
Jim Smith, Atty. Gen. and Calvin L. Fox, Asst. Atty. Gen., for appellee.
Before SCHWARTZ, J., and CHARLES CARROLL, (Ret.), and EZELL, BOYCE F., Jr., (Ret.), Associate Judges.
CHARLES CARROLL, Associate Judge.
The appellant, Mark Royer, was charged by information with unlawful possession of a controlled substance, cannabis, in an amount greater than five grams, and of the crime of unlawful possession thereof with intent to sell or deliver the substance.
The defendant moved to suppress evidence consisting of 65 lbs. of marijuana found in his possession, on the ground that the search and seizure thereof without a *1008 warrant was unlawful. The court denied the motion on the ground that the defendant freely and voluntarily consented to the search, and on the ground that with the defendant fitting the profile of a drug courier and officers had probable cause to believe his luggage contained contraband, justifying a search.[1]
After denial of his motion to suppress, the defendant withdrew his plea of not guilty and pled nolo contendere, with reservation of right to appeal the order. Adjudication was withheld, and no sentence was imposed. The defendant was placed on probation for two years, with one of the conditions of probation being a requirement that he spend 30 days in jail.[2] The defendant appealed, contending the denial of his motion to suppress was error. We hold no reversible error has been shown, and affirm the judgment.
The facts leading up to the search and seizure of the marijuana were the following. Officers Johnson and Magdalena, of the Dade County Public Safety Department, were plainclothes detectives assigned to the County's Crime Bureau, Narcotics Investigation Section, performing duty at Miami International Airport as members of what was known as the Smuggling Detail, consisting of a sergeant and eight officers, who worked in pairs, on shifts. Said officers had acquired knowledge of a "profile" by which it was possible with a substantial measure of certainty to recognize couriers or carriers of drugs in air travel. Such profile had been arrived at by experiences of narcotics officers with a great number of such persons in main drug distribution centers and the target city destination places.
Miami was a known point from which imported drugs, including marijuana, were transported to other target destination cities, one of which was New York City. It was known that commercial airlines were used for such transport of drugs by such couriers and others. On a certain day, at the Miami International Airport, the above-named officers observed the defendant as he was about to purchase a ticket on an airline. The defendant's appearance and mannerisms, his luggage and the way he dealt with it, and his means of obtaining his ticket, etc., as observed by the officers were such as to fit the profile, the details and nature of which we purposely do not here state. As disclosed through the testimony of Officer Johnson, the defendant was observed to fit the profile of a drug courier.
The defendant checked his two suitcases, placing identification labels thereon bearing the name "Holt", but without stating his address or telephone number in the spaces provided therefor on the labels. The officers noted the name which the defendant placed on the suitcases.
As the defendant was proceeding to enter the concourse leading to the boarding area, after having obtained his ticket and checked his suitcases, the officers approached him, identified themselves as police officers, and asked him if he had time to talk with them, which he said he did. There followed a series of requests by the *1009 officers, to none of which the defendant objected, and to each of which the defendant assented. Those consisted of his initial consent to talk to the officers, his production upon request of his ticket (which was to New York City), and his driver's license for identification (which showed his name to be Mark Royer, not Holt which was the name on the ticket); his consent to move with them out of the main room into a vacant side room for further conversation; his consent to the officer's request that the suitcases be opened (after Johnson had retrieved the suitcases). When the officers requested his consent to the opening of the suitcases, the defendant produced a key from his pocket and unlocked one of the cases. He explained that he did not know the combination of the combination lock on the other suitcase, and upon request gave his consent to the opening of the other case by the officers, which they did with the aid of a screwdriver. The search revealed the suitcases contained 65 pounds of marijuana. The testimony given by Officer Johnson, which the court chose to believe, was sufficient to establish, as fact, the consent of the defendant to the several requests of the officers. In his testimony the defendant did not state that he had objected to, or that he had not consented to any of such requests of the officers.[3]
The defendant testified that during the time he was in the presence of the officers he was not told that he was free to leave; and as to each of the steps or requests to which the defendant consented, he testified (1) he was not told that he did not have to consent, and (2) as to each of such consents, when asked by his lawyer why he consented, he gave the same answer, viz., "They were police officers and I thought I had to."
On appeal the defendant does not argue that the court committed error by finding, on the totality of the evidence, that he did so consent, but contends the court's finding of consent was error because he was not told he could refuse consent, and that because such consents were given to police officers as a matter of law it could not be held that his consents were free and voluntary. We reject those contentions as being without merit in this case.
The ruling of the trial court denying the motion to suppress comes here with the support of a presumption of its correctness; and in testing it, on review of the order on appeal, the evidence and the inferences and intendments reasonably deducible therefrom are to be viewed in the light most favorable to sustain the ruling. Rodriquez v. State, 189 So.2d 656, 610 (Fla. 3d DCA 1966). In this case there is little need to summon to our aid that presumption and that rule. Presented with the totality of the circumstances, the trial court found the consent to the search was made freely and voluntarily. That finding of consent by the court is supported by clear and convincing evidence, and defendant does not contend the evidence, as such, showed otherwise. If we were so inclined, which we are not, to substitute our judgment for that of the trial court on its finding of free and voluntary consent, by re-evaluation of the testimony and evidence from the record before us, it would not be proper to do so. Shaw v. Shaw, 334 So.2d 13 (Fla. 1976); Westerman v. Shell's City, Inc., 265 So.2d 43 (Fla. 1972). A warrantless search which is made pursuant to consent does not offend the Fourth Amendment. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).
We hold to be unsound the contention of the defendant that the consents he gave in this instance should be disregarded because *1010 prior thereto he was not told he could refuse to consent. The failure of the officers to have advised the defendant that he did not have to consent to any request by them, including request to search the suitcases, did not operate to render involuntary the consents given by the defendant, although that circumstance, as shown in the evidence, was a factor to be considered by the trial court in assessing the totality of the circumstances on the question of voluntariness, in ruling on the motion to suppress. Schneckloth v. Bustamonte, supra; State v. Spanierman, 267 So.2d 102 (Fla.2d DCA 1972); State v. Custer, 251 So.2d 287 (Fla. 2d DCA 1971); Taylor v. State, 355 So.2d 180, 185 (Fla. 3d DCA 1978). The absence of such advance advice to the defendant was emphasized in the testimony of the defendant, thereby acquainting the court with that circumstance. In holding that the defendant's consent, otherwise free and voluntary, was not thereby rendered involuntary, the trial court was not in error. Taylor v. State, supra [350 So.2d at 185].
When the defendant was talking to the officers voluntarily, he had not been arrested. The fact that at their request he voluntarily went with the officers into a side room where they continued to talk with him and where he remained while his suitcases were retrieved and opened with his permission, did not amount to being in custody so as to have required the giving of Miranda warnings at that time. Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); Barfield v. Alabama, 552 F.2d 1114 (5th Cir.1977). The case of United States v. McCain, 556 F.2d 253 (5th Cir.1977), is distinguishable on the facts. Consent can validate a warrantless search despite lack of warning.[4]
On the question of whether the defendant's consent to the search, found by the trial court to have been freely and voluntarily made, should be held on appeal to be involuntary because it was made to and in the presence of the police officers, we hold that it should not.[5] A consent to a search, which is given to police officers can be voluntary where not the product of duress or coercion by the officers, although a consent to a search which is found to be the product of duress or coercion, express or implied, of the officers, is not a voluntary consent. Therefore, the question of whether a consent to a search was "voluntary" or was the product of duress or coercion is one of fact to be determined from the totality of all the circumstances. See State v. Othen, 300 So.2d 732, 733 (Fla. 2d DCA 1974), which quotes at length on this subject from the opinion of the Supreme Court of the United States in Schneckloth v. Bustamonte, supra.
Here there was no coercive action by the officers. There was no use of force. They did not touch him, or display any weapon, or make any demands. There was no show of force other than the fact, as revealed to the defendant, that Johnson and Magdalena were police officers. The statement to the defendant by one of the officers, when requesting his consent to the opening of the suitcases, that they had reason to believe the cases contained drugs or contraband was not a threat, but rather an explanation of why they were requesting consent to search the cases. The requests which the officers made of the defendant were made politely, and the defendant so testified.
Here each step taken by the officers, to and including the opening of the suitcases, was upon consent given after polite request. In that respect, this case differs from Taylor v. State, supra, 355 So.2d 180 (Fla. 3d DCA 1978), where it was held that the trial court had improperly denied a motion to suppress contraband evidence found on a search of a boat when the consent to search, *1011 upon which the trial court had relied, was obtained by officers after they had begun an unlawful search of the boat. In Taylor, the court said:
"The central question presented for review is whether a free and voluntary consent to conduct a warrantless search of a boat may be obtained by a law enforcement officer from the boat's owner after such officer has begun an admittedly unlawful search of the boat. We hold that, absent a clear and convincing showing of an unequivocal disavowal or break from the prior illegal search sufficient to dissipate the taint of the prior illegality, no such free and voluntary consent can be given as it is tainted by the prior illegal search. As such, any search conducted pursuant to such coerced consent is unreasonable within the meaning of the Fourth and Fourteenth Amendments of the United States Constitution and Article I, Section 12, of the Florida Constitution, and the fruits of such a search are inadmissible in evidence."
In cases of this kind, as said in Schneckloth v. Bustamonte, supra, "two competing concerns must be accommodated in determining the meaning of a `voluntary' consent  the legitimate need for such searches and the equally important requirement of assuring the absence of coercion." In this case, on weighing those competing concerns, the balance was properly found to tilt in favor of finding voluntary consent.
Accordingly, we affirm the order denying the defendant's motion to suppress as evidence the contraband the search revealed, on the ground, as found by the court, of defendant's consent to the search.
In so ruling, we are following a recent decision of this court upholding a warrantless search based on consent in a substantially similar fact situation. See Myles v. State, 374 So.2d 83 (Fla. 3d DCA 1979). In conflict with Myles (and now in conflict with the decision in the present case) is the decision of this court rendered after Myles, in which the Myles case was not cited or discussed. See State v. Frost, 374 So.2d 593 (Fla. 3d DCA 1979).
In Frost the court held the consented-to search was invalid on the theory that the period during which the officers were obtaining the person's identity and his consent was a period of unlawful detention, vitiating the consent to the search. That view in Frost appears to be predicated on an assumption that probable cause which the officers had to believe the person carried contraband drugs would not entitle arrest without a warrant. To the contrary, the view of the majority in this case is that although the officers, when having probable cause to believe the person about to depart was transporting drug contraband, did not make an arrest prior to the (consent) search, they were lawfully entitled to have arrested the person had they chosen to do so.[6]
Basically the conflict between Myles and this case, on the one hand, and Frost, on the other hand, is a difference of opinion as to the effect of a recognized profile of a drug carrier, that is, whether such profile, which gives trained officers probable cause to believe that a person about to depart in air *1012 transit is transporting drug contraband in his luggage, can or cannot be the basis for effective action by the officers absent a warrant.
The rationale of the ruling in this case is that when trained officers spot a departing air travel passenger who with his luggage fits the profile of a drug courier or carrier, giving them probable cause to believe the person is transporting drug contraband, thereby the officers will have probable cause to arrest the person without a warrant in the obvious exigency, and, a fortiori, to search his luggage if he gives consent thereto; and further, as explained below, would be entitled to search the person's luggage even without his consent, in the exigency created by his impending departure therewith.
On the other hand, if we should accept the view that such trained officers, having probable cause to believe a departing person is carrying drug contraband cannot ask his identity and permission to search his luggage without thereby effecting an illegal arrest, then the officers, upon spotting a profile drug carrier would be relegated to stand idly by and watch the passenger and his luggaged contraband depart unimpeded.
We regard the question on which such conflict exists as to the validity of a consent search in such circumstances, to be one of legal and public importance, the ultimate determination of which either will promote the effectiveness or increase the ineffectiveness of law enforcement against smuggling or transportation of drugs through and out of the Miami International Airport by persons who match the profile used to spot drug carrying airline passengers.
That brings us to consideration of the second ground upon which the trial court denied the defendant's motion to suppress. The substance of that separate ground was that luggage which is in air transit, of one who fits the profile of a drug courier, because of the exigent circumstance that it is about to depart in transit can be searched without obtaining a warrant and without the owner's consent, by officers who have probable cause to believe it contains contraband; in this era of drug smuggling, as it was held to be permissible in the prohibition era to stop and search an automobile without warrant or consent, by officers who had probable cause to believe the automobile contained contraband liquor. See Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1926).[7] We agree with the trial *1013 court, and affirm also on that separate ground.
In United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the decision that because of an owner's expectation of privacy as to the contents of his luggage, probable cause of officers to believe that it contained contraband drug would not authorize a warrantless search of luggage, as it would of an automobile, was a holding made with reference to luggage which is not immediately associated with the passenger person, and which is not subject to any exigency to support an immediate search.
From the opinion in Chadwick it is clear that the Court did not foreclose warrantless searches of luggage that is immediately associated with the passenger person and which have the support of an exigency creating a need for immediate search. Thus, in Chadwick, the Court said:
"Here the search was conducted more than an hour after federal agents had gained exclusive control of the footlocker and long after respondents were securely in custody; the search therefore cannot be viewed as incidental to the arrest or as justified by any other exigency. Even though on this record the issuance of a warrant by a judicial officer was reasonably predictable, a line must be drawn. In our view, when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority. Respondents were therefore entitled to the protection of the Warrant Clause with the evaluation of a neutral magistrate, before their privacy interests in the contents of the footlocker were invaded." (Emphasis added)
For example, if officers stopped an automobile which they had probable cause to believe contained contraband, since they could search the automobile, to the extent of dismantling parts of it, it would be unreasonable to assume that because of the holding in Chadwick, the officers could not search suitcases found in the automobile. Accordingly it has been held that upon stopping and searching an automobile under those circumstances, luggage, including suitcases and footlockers contained therein, can be searched.[8]
In the instant case the defendant's suitcases were immediately associated with him. Until he checked them (upon purchasing his ticket), he had actual possession. When the suitcases were checked and he held the check stub, he was in constructive possession thereof. Moreover, in this case the impending departure of the person with his suitcases constituted an exigency creating need for immediate search.
As noted in Carroll v. United States, supra, by common law and by acts of Congress warrantless searches may be made in many instances. No useful purpose would be served by listing them here. In general they are authorized where their use appears essential for effective law enforcement (Internal *1014 Revenue, Customs, vessels at sea, etc.) and conditions of exigency.[9]
More recently, there is the approved practice of warrantless searches of carry-on luggage of airline passengers. Recognizing that the reason for such searches is to guard against passengers' transporting weapons or explosives which could represent a danger in air travel, it should be noted that such warrantless searches are authorized to be made of the carry-on luggage of all departing passengers indiscriminately, aside from and without any profile or circumstances pointing to a particular person as being one who reasonably could be thought to be carrying such banned objects. The exigency which supports warrantless search of a passenger's carry-on luggage has been held to support the seizure of drug contraband which is found upon such a search of a person's carry-on luggage, with the result that drugs so seized were held to be admissible in evidence on his prosecution for possession of the drugs. See United States v. Skipworth, 482 F.2d 1272 (5th Cir.1973).
We hold, as did the trial judge, that when a person with his luggage is about to depart in air travel, if to trained officers the conduct and the appearance of the person and his luggage are such as to make him fit the profile of a drug courier, thereby giving trained officers reasonable cause to believe he is transporting drug contraband, the exigency created by the impending departure is sufficient to support an immediate search of his luggage without a warrant.
To prevent warrantless searches in such exigent circumstances would take away from the officers the power they must have, to be of effective service, for if they cannot search in such exigent circumstances, they are rendered ineffective to control air transportation of drugs by passengers, even when having probable cause to believe the luggage with which a passenger is about to depart contains drug contraband.
For the reasons stated, the order appealed from is affirmed.
SCHWARTZ, Judge (dissenting).
I respectfully but emphatically disagree with the majority's decision to affirm. While an extensive elaboration of my dissenting views would serve no useful purpose, suffice it to say that I believe that (a) when the officers, with his tickets and baggage checks in hand, "asked" Royer to accompany them to the police room at the airport, they effectively took him into custody and, for the purposes of constitutional analysis, placed him under arrest, Dunaway v. New York, 442 U.S. 200, 207, n. 6, 99 S.Ct. 2248, 2253, n. 6, 60 L.Ed.2d 824, 832, n. 6 (1979); State v. Frost, 374 So.2d 593 (Fla. 3d DCA 1979); see United States v. Carollo, 507 F.2d 50 (5th Cir.1975), cert. denied, 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 105 (1975); Brown v. Beto, 468 F.2d 1284 (5th Cir.1972); Trainer v. State, 346 So.2d 1081 (Fla. 1st DCA 1977), cert. denied, 352 So.2d 175 (Fla. 1977); In interest of R.L.J., 336 So.2d 132 (Fla. 1st DCA 1976); (b) the arrest was unlawful because, whether or not the officers were justified in "encountering" Royer in the concourse, see United States v. Wylie, 186 U.S.App.D.C. 231, 569 F.2d 62 (D.C. Cir.1977), cert. denied, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978) or had the "founded suspicion" of criminal activity required to make a temporary investigative stop under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); compare State v. Battleman, 374 So.2d 636 (Fla. 3d DCA 1979) and State v. Frost, supra, and *1015 cases collected at 374 So.2d 593, n. 4, with Myles v. State, 374 So.2d 83 (Fla. 3d DCA 1979), they clearly did not, as one of the officers explicitly admitted below, have the "probable cause" to believe that Royer had committed a felony required to sustain a warrantless arrest, e.g., Bailey v. State, 319 So.2d 22 (Fla. 1975); see Dunaway v. New York, supra; and (c) Royer's "consent" for the opening of his baggage was thus given while he was unlawfully in police custody and was therefore presumptively tainted and involuntary. Bailey v. State, supra, 319 So.2d at 27-28; State v. Frost, supra. Unlike, for example, Husted v. State, 370 So.2d 853 (Fla. 3d DCA 1979) there was nothing to "break the chain" of presumptive coercion. The consent must therefore be deemed invalid as a matter of law. I would follow State v. Frost, supra; Taylor v. State, 355 So.2d 180, 184 (Fla. 3d DCA 1978), cert. denied, 361 So.2d 835 (Fla. 1978); and United States v. Ballard, 573 F.2d 913, 916 (5th Cir.1978), all of which seem to me to be almost precisely on point and to compel reversal. See also Pomerantz v. State, 372 So.2d 104, 111 (Fla. 3d DCA 1979).
The same absence of probable cause which rendered Royer's arrest unlawful also precludes acceptance of the alternative ground relied on to uphold the search. Even if "exigent circumstances" existed, an issue I do not reach, such circumstances serve only to "excuse" the absence of a warrant, see Hornblower v. State, 351 So.2d 716 (Fla. 1977). They do not take the place of the probable cause necessary to sustain any search of the kind involved in this case, whether made with a warrant or without one. E.g., Raffield v. State, 351 So.2d 945 (Fla. 1977).

ON MOTION FOR REHEARING EN BANC GRANTED
Before BARKDULL, HENDRY, HUBBART, SCHWARTZ, NESBITT and BASKIN, JJ.
SCHWARTZ, Judge.
Royer appeals from his conviction for the felony possession of marijuana entered upon a nolo plea with the specific reservation of the right to review the denial of his motion to suppress the contraband in question. Because the majority opinion of the panel which affirmed the conviction conflicted with the prior decisions of this court in State v. Frost, 374 So.2d 593 (Fla.3d DCA 1979) and Taylor v. State, 355 So.2d 180 (Fla. 3d DCA 1978), the court has granted and heard oral argument upon the defendant's motion for rehearing en banc. Fla.R.App.P. 9.331(a), (c).[1] For the reasons which follow, we conclude that the motion to suppress should have been granted. Accordingly, we vacate the panel opinion and reverse the judgment below.
Only two persons testified at the motion to suppress: the defendant Royer, and William *1016 Johnson, one of the two Dade County narcotics officers who effected the search of Royer's suitcases which revealed the cannabis. Since the state prevailed below, we must and do view the evidence in the light most favorable to its position.[2] So considered, the record portrays a series of events which, while they fall generally within the "airport narcotics search" genre, must be considered in terms of their own particular and individual aspects.
Royer was first observed by Johnson and his partner, Magdalena, as he walked across the concourse of the Miami International Airport towards the National Airlines ticket counter, carrying two apparently heavily-laden suitcases. The officers were specifically assigned to interdict the transportation of narcotics through the airport. As Johnson stated, they based their initial decisions as to which travelers to approach upon a series of allegedly suspicious characteristics and circumstances, as contained in the now-familiar "drug courier profile,"[3] supplemented by the airport squad's own prior experiences. It may be fairly said as to all of the officers' bases of "suspicion" that, although they may indeed be characteristic of those who carry narcotics, they are at least equally, and usually far more frequently, consistent with complete innocence. The fallacy of the undistributed middle directly applies: all narcotics couriers act like parts of the profile, but most people who act like parts of the profile are not narcotics couriers. This point is well-illustrated by those aspects of Royer's behavior which attracted the attention of the officers. Johnson said that these were the facts that (a) the defendant was carrying American Tourister baggage of a type which "seemed to be standard brand for marijuana smugging;" (b) he was "nervous in appearance, looking around at other persons as though he might be looking for possible police officers;"[4] (c) he paid for the ticket to New York[5] in cash (and therefore without the necessity of showing identification) from a roll of small-denomination bills; and (d) rather than filling out a full name, address, and phone number on the baggage tags furnished by National, he wrote only the words "Holt" and "LaGuardia" on each of them.
Because of these facts, Johnson and Magdalena approached the "subject" as he left the ticket counter, identified themselves as police officers, and asked if he had a moment to talk. After he said "yes," they asked him to show his airline ticket and, thereafter, some other identification. He agreed to both requests. Like his bags, his ticket bore the name "Holt"; his identification, however, was a driver's license with the name "Mark Royer." When asked to explain the discrepancy, Royer said that a friend had made the reservation in the *1017 name of "Holt."[6] After this conversation, during which Royer became all the more obviously nervous, the officers "told Mr. Royer that we were narcotics investigators, and that we had reason to suspect that he was transporting narcotics." Thereupon
A. [W]e asked him to accompany us to a room that was adjacent to Concourse F to get out of the general population of the Airport.
Q. With regard to the room that you are talking about, how far away from the location you were at at this time was that room?
A. No more than forty feet.
Q. And would you describe the room for the Judge, please?
A. When you walk through the door you are in the Stewardess Lounge of Air Florida. And on the left hand wall of that lounge is what used to be a large storage closet.
We use that-we were at the time using that as our room that we would use for interviewing subjects or for processing people that we-well, actually for anything that we needed to use it for.
Q. Is that an official police room?
A. No, it's a closet that had shelves on one end of it and we fitted a small desk and two chairs in the closet.
Without his consent or agreement, the officers retrieved the suitcases Royer had checked with National and brought them to the "interrogation room." With Royer and his suitcases, and Magdalena and Johnson all in the small room together, the following occurred:
A. We asked Mr. Royer if he would give us consent to search both of the suitcases.
* * * * * *
Q. Do you recall what it was that you asked him?
A. To the best of my recollection, it was something to the effect that we suspected that he was carrying narcotics, and that we would like him to open the suitcases to allow us to see what was in them to dispel that suspicion or to confirm that suspicion.
Q. What, if anything, did the Defendant say at that time?
A. He was extremely nervous about it and he didn't say anything specifically that I can recall.
He produced a key out of his pants pocket and opened the white suitcase. And he stated to us that he didn't know the combination for the gray one which appeared to be brand new.

*1018 I asked him if we could open it, the gray one; did he have any objection, and he said, `No, go ahead.'
I explained to him I might have to break it and he had no objection to that.
Q. With regard to the white one, did he say anything prior to opening the suitcase?
A. No.
Q. Did he open it or did you?
A. He unlocked it and I opened it.
Each of the two suitcases contained a substantial amount of marijuana.
During cross-examination, officer Johnson specifically acknowledged that he did not have probable cause to place Royer under arrest at any time prior to opening the suitcases. Notwithstanding this admission, the trial judge denied the motion to suppress on the two separate grounds that (a) the defendant had freely and voluntarily consented to the search of his suitcases, and (b) in the airport-search context, "the officer doesn't have the time to run out and get a search warrant because the plane is going to take off. If there is going to be anything occurring, it's going to occur long before they can take any type of action." We can agree with neither asserted basis for the order below.

Consent Invalid
Upon a three step legal analysis of the facts involved in this case, we reject the state's primary argument for affirmance, that is, that Royer effectively and validly consented to the opening of his suitcases.
1) Royer Involuntarily Confined. It is first entirely clear that, when Royer gave his silent "consent" to the search of his suitcases, his liberty had been involuntarily restrained within the interrogation room. At that time, the defendant found himself in a small enclosed area being confronted by two police officers-a situation which presents an almost classic definition of imprisonment. Even beyond this, the officers had previously informed him that they had reason to suspect that he was transporting narcotics, which, by indicating that a criminal investigation had focused upon him, provided another clear sign that he had in fact been taken into custody. Brown v. Beto, 468 F.2d 1284 (5th Cir.1972); United States v. Phelps, 443 F.2d 246 (5th Cir.1971). Finally, his plane ticket and, perhaps more important, his luggage had been taken from him; if he had been permitted to leave the room at all, he could not go to New York without buying a new ticket, and could go nowhere without abandoning his suitcases.[7] In United States v. McCain, 556 F.2d 253 (5th Cir.1977), the court stated the retention of one's baggage precludes even a doubt that he was "in custody."
Applying the test adopted in Frost, it is obvious that Royer, as he himself testified, was "under [the] reasonable impression that he [was] not free to leave the officer's presence." 374 So.2d at 597, adopting United States v. Wylie, 569 F.2d 62, 68 (D.C. Cir.1977), cert. denied, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978).[8] Of course, this apprehension was much more than a well-justified subjective belief. As common sense tells us, and as the state conceded at the oral argument, the officers would not have permitted Royer to leave the room even if he had erroneously thought he could.
*1019 2) No Probable Cause. For all practical purposes, Royer had been placed under arrest when the alleged consent was given. The exact nomenclature employed to describe his situation is, however, unimportant. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) makes clear that a police confinement which, as is obviously true in this case, goes beyond the limited restraint of a Terry[9] investigatory stop may be constitutionally justified only by probable cause. As Johnson specifically admitted below, no such probable cause existed in this case.
Since, as we have noted, the conduct involved is typically just as consistent with innocence as with guilt, the weight of authority on the question is that a mere similarity with the contents of the drug courier profile is insufficient even to constitute the articulable suspicion required to justify a Terry stop. E.g., Reid v. Georgia, ___ U.S. ___, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); United States v. Ballard, supra; State v. Frost, supra, at 374 So.2d 593, n. 4; State v. Key, 375 So.2d 1354 (La. 1979); contra, United States v. Mendenhall, supra (opinion of Powell, J., concurring in part, concurring in judgment). Even were the rule otherwise, and whether or not the additional false identification factor would be deemed to provide such "founded suspicion,"[10] there can be no question that all the facts and circumstances, including that one,[11] were not "sufficient in themselves to warrant a man of reasonable caution in the belief that a [felony] has been or is being committed," and thus to constitute probable cause. E.g., Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 555 (1925); Bryant v. State, 155 So.2d 396 (Fla. 2d DCA 1963), and cases collected; 14 Fla.Jur.2d Criminal Law § 388 (1979). The cases which treat factual patterns similar to or even stronger than this one unanimously hold that they do not give rise to probable cause. E.g., United States v. Moore, 483 F.2d 1361 (9th Cir.1973); see, United States v. Pope, 561 F.2d 663 (6th Cir.1977); United States v. McCaleb, 522 F.2d 717 (6th Cir.1977). We have been cited to and have found not a single decision to support the state's contrary position. It would be a pernicious doctrine indeed which would permit the arrest of any citizen essentially upon the basis of his perceived resemblance to a sterotypical criminal. We decline to be the first court to adopt such a principle.
3) Consent Tainted and Invalid. The consent was thus given after Royer had been unlawfully confined. Under these circumstances, the rule restated in Norman v. State, 379 So.2d 643, 646-47 (Fla. 1980) directly applies:
[W]hen consent is obtained after illegal police activity such as an illegal search or arrest, the unlawful police action presumptively taints and renders involuntary and consent to search. Bailey v. State, [319 So.2d 22 (Fla. 1975)]; Earman v. State, 265 So.2d 695 (Fla. 1972); Taylor v. State, [355 So.2d 180 (Fla. 3d DCA 1978)]. See Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The consent will be held voluntary only if there is clear and convincing proof of an *1020 unequivocal break in the chain of illegality sufficient to dissipate the taint of prior official illegal action. Bailey v. State, 319 So.2d at 28; Sheff v. State, 329 So.2d 270 (Fla. 1976).
Accord, e.g., United States v. Ballard, supra; State v. Frost, supra; Pomerantz v. State, 372 So.2d 104, 111 (Fla. 3d DCA 1979). Since, unlike Husted v. State, 370 So.2d 853 (Fla. 3d DCA 1979) and United States v. Mendenhall, supra, in both of which the defendant was specifically informed of the right to refuse consent, but like Frost, there was no proof at all of any "break in the chain of illegality," Royer's consent must be deemed involuntary and thus invalid as a matter of law.

"Exigent Circumstances" Irrelevant
The same absence of probable cause which rendered Royer's confinement unlawful also precludes acceptance of the alternative ground relied upon to uphold the search. We do not decide whether "exigent circumstances" are involved in departing airline passenger cases like this one[12] because, even if they exist, such circumstances serve only to "excuse" the absence of a warrant. See, Hornblower v. State, 351 So.2d 716 (Fla. 1977). They do not take the place of the probable cause necessary to sustain any search of the kind involved in this case, whether made with a warrant or without one. E.g., Raffield v. State, 351 So.2d 945 (Fla. 1977).
The judgment below is therefore reversed and the cause remanded with directions to discharge the defendant.
Reversed and remanded.
HUBBART, Judge (concurring).
I concur in the judgment of the court; I also concur in the opinion of the court except insofar as it concludes that the entire "drug courier profile," as developed by state and federal law enforcement officials for use at major airports, represents innocent behavior which is insufficient in any case to constitute reasonable suspicion for the temporary stop of an air traveler in an airport. I regard such a conclusion as unwarranted under the established law, and, in any event, unnecessary to the decision in this case and, therefore, obiter dicta. The issue is of sufficient importance, however, that a separate concurring opinion seems appropriate.

A
At the outset, I entirely agree with the court that the "drug courier profile" behavior exhibited by the defendant herein, did not in this case [and could not, without more, in any case] constitute probable cause for the defendant's arrest and detention in the police interrogation room at the airport, that this unreasonable arrest plus the unauthorized seizure of the defendant's luggage presumptively tainted and rendered involuntary the defendant's "consent" given to the police to search his luggage, and that the marijuana seized by the police without a search warrant from the defendant's luggage was inadmissible in evidence at trial as it constituted the fruit of an unreasonable search and seizure condemned by the state and federal constitutions. Indeed, I read the court's decision to precisely so hold, and as to this holding, I am in complete agreement.
I cannot agree, however, with the court's broadside attack against the "drug courier profile" presented in this case as being "at least equally, and usually far more frequently, consistent with complete innocence," [p. 1016], as suffering from the "fallacy of the undistributed middle" in that "most people who act like parts of the profile are not narcotics couriers," [p. 1016], and as representing entirely innocuous behavior in that "the conduct involved is typically just as consistent with innocence as with guilt" [p. 1019]. Nor do I agree *1021 with the court's equally sweeping legal conclusion, based on a misreading of existing case law, that "a mere similarity with the contents of the drug courier profile is insufficient even to constitute the articulable suspicion required to justify a Terry stop." [p. 1019], and that "a conformance without more, to one or more elements of the profile does not amount to articulable suspicion [for a Terry stop]." [p. 1017, fn.6]. These pronouncements are not only unnecessary to the decision herein,[1] but are, in my view, unsupported by the existing case law.

B
In analyzing whether a temporary seizure of a person by the police for investigative purposes under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), is "reasonable" within the meaning of the Fourth Amendment to the United States Constitution and Article I, Section 12 of the Florida Constitution, we are guided by the following controlling principles of law:
"The touchstone of our analysis under the Fourth Amendment is always `the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' (citation omitted). Reasonableness, of course, depends `on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law [enforcement] officers.'" (citation omitted). Pennsylvania v. Mimms, 434 U.S. 106, 108-109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977).
"Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. (citation omitted).
A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. (citations omitted). To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure *1022 must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." (citations omitted). Brown v. Texas, 443 U.S. 47, 50; 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357, 362 (1979).
"The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of `reasonableness' upon the exercise of discretion by governmental officials, including law enforcement agents, in order `to safeguard the privacy and security of individuals against arbitrary invasions....' (citations omitted). Thus, the permissibility of a particular law-enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement by an `objective standard,' whether this be probable cause or a less stringent test." Delaware v. Prouse, 440 U.S. 648, 653-654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979).
Based on the above cases, there appear to be three central factors involved in determining whether a temporary seizure of a person by the police is constitutionally "reasonable": (i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied to make the temporary seizure in light of his knowledge and experience. United States v. Mendenhall, ___ U.S. ___, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (Powell, J., concurring).
As applied to the temporary seizure of an air traveler by the police in a major metropolitan airport based on the "drug courier profile" behavior, the cases to date yield no talismatic rule either upholding or striking down such seizures. In struggling with this immensely difficult problem, the courts, presented with a myriad of fact patterns, have upheld some such seizures[2] while striking down others.[3] The results in each case appear to turn on the nature of the profile behavior shown in the particular case and the court's perception of how objectively suspicious the behavior in question seems to be. Moreover, the courts have considered "drug courier profile" behavior as part of the total composite of founded suspicion, along with other suspicious conduct, in sustaining temporary stops of air travelers at major airports.[4]
In this connection, the established law is accurately stated in our decision in State v. Mitchell, 377 So.2d 1006 (Fla. 3d DCA 1979):
"The law is well-established that a police officer may make an investigative stop if he has a `founded suspicion' that an individual is involved in criminal activity (citation omitted). Further, while the drug courier profile by itself provides no probable cause to arrest an individual, a set of facts may arise in which the existence of certain profile characteristics constitutes reasonable suspicion to warrant the intrusion of an investigative stop." Id. at 1008. [emphasis added].
The court herein makes no effort to qualify or upset the above statement of law in *1023 Mitchell. As such, it still stands as good law in this district and, indeed, accurately states the law throughout the country.
The court's reliance herein on United States v. Mendenhall, 596 F.2d 706 (6th Cir.1979); United States v. Smith, 574 F.2d 882 (6th Cir.1978); United States v. Ballard, 573 F.2d 913 (5th Cir.1978); United States v. McCaleb, 552 F.2d 717 (6th Cir.1977); United States v. Rico, 594 F.2d 320 (2d Cir.1979) [cases collected in State v. Frost, 374 So.2d 593, 596 fn. 4 (Fla. 3d DCA 1979)] and State v. Key, 375 So.2d 1354 (La. 1979), for a contrary result is misplaced. None of these cases announce a rule which invalidates all temporary stops of air travelers at airports based on the "drug courier profile" save possibly United States v. Smith, 574 F.2d 882 (6th Cir.1978), and that in a rather watered down version in a case which in fact upheld the temporary airport stop. ("[T]he rule has emerged that the characteristics of the drug courier profile are not alone enough to provide probable cause to arrest nor necessarily enough to create a reasonable suspicion to stop under Terry.") Indeed, United States v. McCaleb, 552 F.2d 717, 720 (6th Cir.1977), states:
"We agree with the conclusion of the district judge that the `drug courier profile,' by itself, provides no probable cause to arrest an individual. In addition, while a set of facts may arise in which the existence of certain profile characteristics constitutes reasonable suspicion, the circumstances of this case do not provide `specific and articulable facts which taken together with rational inferences from these facts, reasonably warrant[ed] `the intrusion of an investigatory stop.'." [emphasis added]
And United States v. Mendenhall, 596 F.2d 706, 707 (6th Cir.1979) (en banc) states:
"Examination of these records and re-examination of precedent in these airport drug search cases in this and other Appellate Courts have led to our decision not to attempt to formulate definitive rules. Despite some general similarities, every single case differs from every other in material degree."
It should also be noted that the Mendenhall court's result in striking down the airport search involved has since been reversed by the U.S. Supreme Court. United States v. Mendenhall, ___ U.S. ___, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). As such, I cannot agree with this court and the Frost court's reading of the above cases, which is concededly dicta, that "drug courier profile" behavior cannot in any case constitute reasonable suspicion for a temporary stop of an air traveler in an airport. These cases state no such definitive rule, but proceed on a case-by-case basis.

C
In determining whether in a given case "drug courier profile" behavior rises to the level of reasonable suspicion for a temporary stop of an air traveler in an airport, the decisions to date necessarily involve an application of the previously stated three constitutional factors to the particular facts of the case. These factors, in turn, require careful consideration.

1
First, the public interest served by the temporary seizures of air travelers under discussion, particularly at the Miami International Airport, is without a doubt an immensely important one. Indeed, any fair-minded person must surely conclude, in view of the overwhelming evidence available, that South Florida is being inundated with a multi-million dollar narcotic drug traffic derived in large part from sources outside the country. That traffic by any standard is corrupting this society and simultaneously bringing with it an unprecedented degree of violence and murder which is not unknown in the Great Miami area. It is undisputed that this drug traffic utilizes, in part, the Miami International Airport to transport narcotic drugs through *1024 drug couriers to various parts of the country.[5]
Mr. Justice Powell in United States v. Mendenhall, ___ U.S. ___, ___, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497, 514 (1980), has further emphasized the importance of the public interest served by the temporary seizures under discussion:
"The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit. Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances. Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs, including heroin, may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement."
The gravity of the governmental interest in suppressing the drug traffic is, therefore, considerable, and that interest is surely served by the temporary seizure of air travelers at the Miami International Airport for further investigation.

2
Secondly, the nature and scope of the intrusion into personal privacy represented by the temporary seizures under discussion is a carefully limited one. No arrest or embarrassing trip to the police station is involved; no frisk of the person follows;[6] and no handcuffing or actual physical restraint is accomplished. Airline travelers are merely required by these detentions to stop temporarily, produce their ticket and identification, and generally answer brief questions about themselves, their luggage and their travel plans. This is surely not a humiliating invasion of personal privacy, but an extremely limited intrusion particularly when viewed against the lesser expectation of privacy which is reasonably entertained by air travelers in airports. Such travelers, for example, expect from time to time to display their ticket or identification and explain their travel plans to various people in the airport. Moreover, electronic searches of air travelers and their luggage are now accepted as routine. We deal then with what, in my view, constitutes a cognizable, but minimal intrusion of personal privacy.

3
Thirdly, the evidentiary basis for the above temporary seizures as represented by the "drug courier profile" behavior varies with each case. Such a profile has been described as "a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics." Reid v. Georgia, ___ U.S. ___, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). We must weigh this varying evidentiary showing in each case against the strong governmental interest involved and the minimal invasion of privacy accomplished by the temporary detentions under discussion.
Viewed individually and in the abstract, I must agree with the court that some of the characteristics of the profile as seen in this case seem harmless enough and, therefore, of no evidentiary consequence. We cannot, however, view these characteristics individually or in the abstract as we deal with a composite picture of behavior which entails a good deal more than superficial observation might yield. We have and cannot ignore the law enforcement experience of the federal Drug Enforcement Administration at the Detroit Airport, which agency developed *1025 the "drug courier profile" under discussion. Mr. Justice Powell in United States v. Mendenhall, ___ U.S. ___, ___, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497, 514 (1980), reports the results of this experience as follows:
"[T]he Drug Enforcement Administration since 1974 has assigned highly skilled agents to the Detroit airport as part of a nationwide program to intercept drug couriers transporting narcotics between major drug sources and distribution centers in the United States. Federal agents have developed `drug courier profiles,' that describe the characteristics generally associated with narcotics traffickers. For example, because the Drug Enforcement Administration believes that most drugs enter Detroit from one of four `source' cities (Los Angeles, San Diego, Miami, or New York), agents pay particular attention to passengers who arrive from those places. See United States v. Van Lewis, 409 F. Supp. 535, 538 (ED Mich. 1976), aff'd, 556 F.2d 385 (CA6 1977). During the first 18 months of the program, agents watching the Detroit airport searched 141 persons in 96 encounters. They found controlled substances in 77 of the encounters and arrested 122 persons. Id., at 539."
In addition, the court in its opinion herein has recognized the experience of the Dade County Public Safety Department's drug enforcement unit at the Miami International Airport which has worked for some time with the "drug courier profile" developed by the federal DEA. During the period from October 1, 1977 through May 31, 1979, the above airport drug unit initiated 512 narcotics investigations at the Miami International Airport based on the "drug courier profile" which resulted in the identification of 386 narcotics drug couriers, the arrest of 298 drug couriers and the interception of 48 narcotic shipments.[7]
Based on this law enforcement experience, the "drug courier profile" cannot be viewed, as I think the court's opinion herein implies, as neutral behavior having little or no suspicious connotation. Obviously, such conduct has incriminating evidentiary value and cannot be dismissed as trivial or logically fallacious. Still, too much can be claimed for the profile. It is admittedly informal, very much in the development stages, and, as yet, has no rigid content. As such, the cases have recognized that "drug courier profile" behavior can never constitute, without more, probable cause to effect a full custodial arrest or search.[8] The cases have further recognized that such behavior must be examined case by case in determining whether it alone, or in combination with other suspicious conduct, is sufficient to make a temporary airport stop. As to the latter, the courts appear to focus in each case on whether the behavior exhibited sets the suspect suspiciously apart from the normal run of air travelers sufficient to justify the minimal intrusion of privacy under discussion. In this connection, it should be noted that profile behavior in spotting other criminal suspects at airports, such as potential skyjackers, have generally received a favorable reception in the courts as a valid basis for effecting certain limited detentions of air travelers. See United States v. Cyzewski, 484 F.2d 509 (5th Cir.1973), cert. *1026 dism. 415 U.S. 902, 94 S.Ct. 936, 39 L.Ed.2d 459 (1974); United States v. Bell, 464 F.2d 667 (2d Cir.1972), cert. den. 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972).

D
In sum, we deal with an immensely complicated constitutional problem which is not aided by the court's wholesale dismissal of the "drug courier profile" as being of little or no evidentiary consequence and insufficient in any case to constitute reasonable suspicion for the temporary stop of an air traveler in an airport regardless of the number of characteristics in the profile exhibited by the suspect. Such a sweeping statement of law is unsupported by the cases to date, and, in any event, represents obiter dicta in this case. We must proceed, in my view, to approach temporary "drug courier profile" stops in airports according to a careful case-by-case constitutional analysis much as the established law has developed in the past with respect to temporary Terry stops. With these reservations, I concur in the judgment and opinion of the court.
BARKDULL, Judge, specially concurring.
I concur in the opinion authored by Judge Schwartz as it relates to the invalid consent to search only because of the failure of the law enforcement officers to return the ticket and their failure to advise Royer that he had a right to decline the search if he desired. See and compare: United States v. Mendenhall, ___ U.S. ___, 100 S.Ct. 1870, 64 L.Ed.2d 497.
NOTES
[1] In denying the motion to suppress, the trial court stated as follows:

"Motion to suppress be in (sic) the same is hereby denied. We are dealing with an unusual circumstance. Profile searches, as they have been called, I believe, is something new. But then at the time [of] the Carroll decision, the search of an automobile and the manner in which it took place, was something new. What is reasonable in one circumstance may not be reasonable in another circumstance. Number one, the Court's ruling, on denying the motion to suppress, is that the Court believes that the consent was freely and voluntarily given. By the same token, I think under circumstances such as this where the police officers are in an airport and are surveilling, as testified to by the officer, with a specific profile that they are following, that the officer doesn't have the time to run out and get a search warrant because the plane is going to take off. If there is going to be anything occurring, it's going to occur long before they can take any type of action. So it's a denial on dual grounds. Might as well get it tested whether it's reasonable or unreasonable because, I assume you are taking an appeal?"
[2] Each of the charged offenses was a third degree felony under § 893.13(1)(a)(2), Fla. Stat. (1975), and was punishable by a term of imprisonment not to exceed five years [§ 775.082, Fla. Stat. (1975)].
[3] The testimony of Officer Johnson and of the defendant conflicted on only one item. Johnson testified that when he asked the defendant for permission to open the suitcases the defendant produced a key from one of his pockets and used it to unlock the one case. The defendant testified that previously the officers had had him empty his pockets, and that he had obtained the key with which he opened one of the cases from the top of a desk upon which the contents of his pockets had been placed by him. In rebuttal thereto, Johnson testified again that the defendant took the key from his pocket to open the case, and testified that the defendant had not been requested to empty his pockets until after he was arrested, after the suitcases had been opened.
[4] State v. Wise, 356 So.2d 920 (Fla. 2nd DCA 1978); Cockerham v. State, 237 So.2d 32 (Fla. 1st DCA 1970); James v. State, 223 So.2d 52 (Fla. 4th DCA 1969).
[5] The establishment of such a rule of law would operate to permit a person, by purposely and intentionally giving his consent to officers to make a warrantless search which revealed contraband, thereby to make sure that subsequently there could be no use of the contraband as evidence.
[6] As arrest was made in United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). There the travel was by Amtrak train, from San Diego to Boston. The luggage was a footlocker. The arrest, prior to search of the luggage, was based on profile. As stated by the Supreme Court, "Because Machado [one of the two departing passengers] matched a profile used to spot drug traffickers" the railroad officials notified the federal agents in San Diego who passed the information on to their Boston counterparts, with descriptions of the passengers and luggage. When the passengers arrived in Boston, claimed the footlocker, and were loading it into an automobile which arrived to meet them, they and the driver of the automobile were arrested, and they with the footlocker were taken to the Federal Building. There, an hour and a half later, the footlocker containing contraband was opened without a search warrant having been obtained. In the trial of that case, the exclusion as evidence of the contraband from the footlocker was not on the ground that the arrest had been illegal, but on the ground that the search and seizure were unlawful, when made without a warrant after such period of time when the footlocker had been taken and was held in exclusive custody of the Government and when there was no exigency to support need for immediate search.
[7] In Carroll v. United States, supra, in which the opinion of the Court was written by William Howard Taft, Chief Justice of the United States, it was held that an automobile could be stopped and searched (for contraband liquor) when "the seizing officer shall have reasonable or probable cause for believing that the automobile which he stops and seizes has contraband liquor therein which is being illegally transported."

In Carroll, the facts as stated by the Court were as follows. On September 20, 1921, the officers involved, posing as civilians, in an apartment maintained by them in Grand Rapids, Michigan, met with Carroll, Kiro and Kruska, known to them to be bootleggers based in Grand Rapids. The officers arranged to purchase three cases of whiskey from them, and they left to get the whiskey. Kruska returned and reported it could not be delivered then, but that it would be delivered the next day. No such later delivery was made. The officers had observed the Oldsmobile roadster in which the men had come to the meeting. Several weeks later, on October 6, 1921, while said officers were patrolling the Detroit to Grand Rapids highway, they were passed by Carroll and Kiro in the Oldsmobile, driving east toward Detroit. The officers followed, "to see where they were going," but lost sight of them in the traffic. Two months later, on December 15, 1921, while driving east on said highway, the officers were passed by Carroll and Kiro in the Oldsmobile, driving west. The officers turned around, and overtook and stopped the Carroll automobile at a point 16 miles east of Grand Rapids. They searched the car and seized 68 bottles of contraband imported whiskey and gin, which they found hidden behind the upholstery of the automobile seats, from which the filling had been removed.
In Carroll, the probable cause of the officers to believe the Carroll automobile carried contraband liquor was based in substantial part on a profile. Augmenting knowledge that Carroll and Kiro were bootleggers, there was only the profile situation to cause belief that the car, on that occasion, contained contraband. The officers did not have any advance information or tip that said automobile would be on the highway that day carrying liquor. On the contrary, as noted by the Court in its statement of the facts, "The officers were not anticipating that the defendants would be coming through on the highway at that particular time, but when they met them there they believed that they were carrying liquor; and hence the search, seizure and arrest."
The fact that Carroll and Kiro were known to be bootleggers would not have authorized an officer to stop and search the Carroll automobile in all circumstances, such, for example, as if Carroll had been observed driving his car on a residential street in Grand Rapids on a Sunday morning en route to his home from church. The profile circumstances which authorized the search at the time and place when it was made were that Detroit was known to be a main point of distribution of imported contraband liquor, and that the Detroit to Grand Rapids highway was known to be a route used by bootleggers in the transportation and distribution of such contraband by automobile to Grand Rapids and to the "hinterland." Based thereon the Court held that upon observing the bootleggers driving toward Grand Rapids on the Detroit to Grand Rapids highway the officers had probable cause to believe the automobile contained contraband liquor, and thereby were authorized to stop and search the automobile without a warrant.
[8] United States v. Tramunti, 513 F.2d 1087, 1104-1105 (2d Cir.1975) (suitcase); United States v. Soriano, 497 F.2d 147 (5th Cir.1974) (suitcases); United States v. Evans, 481 F.2d 990, 993-994 (9th Cir.1973) (footlocker).
[9] The holding of this court in Pomerantz v. State, 372 So.2d 104 (Fla. 3d DCA 1979), that a warrantless search of three suitcases which had been checked for air transit was unlawful, is distinguishable on the facts from the situation presented in this case. There, in the handling of the suitcases after they were checked, one of them flew open. Its contents were disclosed to consist of a filled opaque bag [which in fact contained marijuana]. When it and the other suitcases were searched, the officers had no knowledge as to the ownership thereof, or as to who had checked them. The person who checked the three suitcases had not been observed by officers. There was no profile of a drug-carrying passenger connected with the luggage in question.
[1] Fla.R.App.P. 9.331(a) specifically provides that "[a] district court of appeal en banc shall consist of the judges in regular active service on the court." Accordingly, the court which heard and decided the motion for rehearing en banc in this case did not include Associate Judges Carroll and Ezell, who formed the majority of the original panel. On the basis of the clear provision of the rule, we overrule the appellee's objection to the absence of these judges from the en banc court. It should be noted that the fifth circuit cases cited in support of the state's position, Allen v. Johnson, 391 F.2d 527 (5th Cir.1968) and Luna v. Beto, 395 F.2d 35 (5th Cir.1968) were decided pursuant to the then-applicable provisions of 28 U.S.C. § 46 (c), which explicitly stated:

"(c) Cases and controversies shall be heard and determined by a court or division of not more than three judges, unless a hearing or rehearing before the court in banc is ordered by a majority of the circuit judges of the circuit who are in regular service. A court in banc shall consist of all circuit judges in regular active service. A circuit judge of the circuit who has retired from regular active service shall also be competent to sit as a judge of the court in banc in the rehearing of a case or controversy if he sat in the court or division at the original hearing thereof." [e.s.]
The emphasized sentence has no equivalent in the Florida rule, and was eliminated even from the Federal code in 1978. Pub.L. 95-486, § 5(a), (b), 92 Stat. 1633. Under the present code provision, which is essentially identical to our rule, visiting or senior judges who have served on the initial panel do not hear rehearings en banc in the federal circuit courts of appeals. See Fifth Circuit Rule 16.1; Fed.R. App.P. 35.
[2] Franklin v. State, 374 So.2d 1151 (Fla. 3d DCA 1979); State v. Williams, 371 So.2d 1074 (Fla. 3d DCA 1979), cert. denied, 381 So.2d 771 (Fla. 1980).
[3] See e.g., United States v. Ballard, 573 F.2d 913 (5th Cir.1978) and cases cited in State v. Frost, supra, at 374 So.2d 593, n. 4.
[4] Johnson stated that he was able to detect a difference in the manner or type of wariness exhibited by a narcotics courier as opposed to the "perceptibly different type of nervousness" characteristic of "white knuckle type" flyers or others who were just plain nervous people. The effect of any such amateur forensic psychiatry must be completely disregarded. It is true that, in determining the existence of either founded suspicion or probable cause, an officer's expertise should be considered. But this special knowledge must be based upon some specific objective fact which the officer knows from experience is associated with criminality. That small tin foil packets invariably contain contraband is one such example. See, Bush v. State, 369 So.2d 674 (Fla. 3d DCA 1979). On the other hand, it would be gravely dangerous to the very basis of our system to attach any legal credence to the subjective avowals of a policeman (or anyone else) that he can tell a criminal when he sees one or that he knows "from his experience" that the guilty look or act differently from the innocent.
[5] The officers were in the vicinity specifically to watch those boarding a National flight to Los Angeles-a profile "target city"-which was scheduled to leave shortly after Royer's flight to New York. It was not suggested that flying to New York City is itself suspicious, though it was implied otherwise concerning Los Angeles.
[6] In Frost the assistant state attorney in the trial court agreed that this was a reasonable explanation, and the state stipulated on appeal that this fact, along with others very similar to those here, did not amount even to the "founded suspicion" necessary to support a Terry stop, much less the probable cause which is required for an arrest (and which was found to exist by the majority of the panel in this case). We were therefore not required to and did not adjudicate those issues in Frost. Moreover, Frost did not involve the additional fact, present in this case, that the false name had also been placed on defendant's baggage, thus tending to dissipate the reasonableness of the explanation concerning the reservation. Since we hold, infra, that probable cause was required in this case and did not exist, we need not decide whether on this ground there was founded suspicion to justify "stopping" Royer. See also, Myles v. State, 374 So.2d 83 (Fla. 3d DCA 1979); State v. Mitchell, 377 So.2d 1006 (Fla. 3d DCA 1979); State v. Battleman, 374 So.2d 636 (Fla. 3d DCA 1979).

We see no reason, however, to depart from our stated agreement in Frost at 374 So.2d 593, n. 4 with the decisions that a conformance, without more, to one or more elements of the profile does not amount to articulable suspicion. Accord, Reid v. Georgia, ___ U.S. ___, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); contra, United States v. Mendenhall, ___ U.S. ___, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (opinion of Powell, J., concurring in part, concurring in judgment). The Mitchell case, in which the police had specific incriminating information about the particular suspect, is not contrary to this view. Nor, as we read them, are the second circuit decisions cited in footnote 2 of Judge Hubbart's concurring opinion. In each instance, far more in the way of suspicious activity than adherence to the "profile" was involved. Probably because of this, none of the three cases even professes reliance on the profile, and United States v. Vasquez-Santiago, 602 F.2d 1069, 1072 (2d Cir.1979) expressly disclaims it.
[7] All these facts are decisively different from those in United States v. Mendenhall, supra.
[8] The only actual holding in the Frost case was that a Terry stop had been effected when the officers took and retained possession of the defendant's driver's license and airline ticket, thus requiring founded or articulable suspicion. See note 6, supra. Compare United States v. Mendenhall, supra, in which the officers returned the defendant's ticket and driver's license. Our decision in this case, which involves far more than a mere "stop," does not affect that conclusion, which we specifically reendorse. See also, United States v. Mendenhall, supra, (opinions of Powell, J., note 1; and White, J., dissenting). It should be emphasized, however, that we did not then, nor do we now, pass upon the issue of whether, as indicated in several cases cited only in dictum in Frost, a stop takes place as soon as an officer approaches a suspect and asks to speak to him. Contra, e.g., United States v. Mendenhall, supra (opinion of Stewart, J.); State v. Shy, 373 So.2d 145 (La. 1979).
[9] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[10] See, e.g., State v. Ramos, 378 So.2d 1294, 1298 (Fla. 3d DCA 1979) (facts raised articulable suspicion but were "insufficient to constitute probable cause for arrest"); Franklin v. State, supra (same); note 6, supra.
[11] It should be noted that Royer did not misidentify himself to the police officers; he merely employed another name on his ticket and baggage. See note 6, supra. In our view, one's use in this manner of a name which is not his own, while perhaps suspicious, is not unlawful and certainly does not give rise to a reasonable belief that he is in the process of committing a felony. See, United States ex rel. Kirby v. Sturges, 510 F.2d 397 (7th Cir.1975) ("Admittedly, the possession of property bearing someone else's name would not constitute probable cause for petitioner's arrest."). Cf., Hill v. California, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971) ("Aliases and false identifications are not uncommon."); United States v. Stamps, 430 F.2d 33 (5th Cir.1970).
[12] We note, however, that when there is probable cause (secured from a "dog sniff" or otherwise, see State v. Goodley, 381 So.2d 1180 (Fla. 3d DCA 1980)), to support a valid arrest, both the traveler and his baggage would thereafter not be going anywhere. There would then be adequate time, opportunity and basis to secure a warrant to open his suitcases as required by United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).
[1] We deal in this case with a coerced consent to search which was fatally tainted and rendered involuntary by an illegal arrest of the defendant and an unauthorized seizure of his luggage. We, therefore, have no occasion to decide whether, in the abstract, the police would have been authorized to temporarily detain the defendant herein. Indeed, the court concedes as much as footnote 6 of its opinion. ("Since we hold, infra, that probable cause was required in this case and did not exist, we need not decide whether on this ground there was founded suspicion to justify `stopping' Royer."). The court's above-stated pronouncements on the issue are, therefore, unnecessary to the decision and, in my view, obiter dicta.

In this connection, I find Judge Schwartz' carefully reasoned dissent from the panel decision in this cause extremely persuasive:
"I respectfully but emphatically disagree with the majority's decision to affirm. While an extensive elaboration of my dissenting views would serve no useful purpose, suffice it to say that I believe that (a) when the officers, with his tickets and baggage checks in hand, `asked' Royer to accompany them to the police room at the airport, they effectively took him into custody and, for the purposes of constitutional analysis, placed him under arrest, (citations omitted); (b) the arrest was unlawful because whether or not the officers were justified in `encountering' Royer in the concourse, (citation omitted) or had the `founded suspicion' of criminal activity required to make a temporary investigative stop under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); (citations omitted), they clearly did not, as one of the officers explicitly admitted below, have the `probable cause' to believe that Royer had committed a felony required to sustain a warrantless arrest (citations omitted); and (c) Royer's `consent' for the opening of his baggage was thus given while he was unlawfully in police custody and was therefore presumptively tainted and involuntary." Royer v. State, 389 So.2d 1007 (Fla. 3d DCA 1979).
Moreover, I read the court's en banc decision as holding precisely in accord with Judge Schwartz' dissent with the addition that the "consent" given was also coerced by the illegal police seizure of the defendant's luggage. Unfortunately, the court has added additional sweeping language in its en banc opinion which is unnecessary, in my view, to the decision herein.
[2] See e.g. United States v. Vasquez, 612 F.2d 1338 (2d Cir.1979); United States v. Vasquez-Santiago, 602 F.2d 1069 (2d Cir.1979); United States v. Price, 599 F.2d 494 (2d Cir.1979); also see United States v. Mendenhall, ___ U.S. ___, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (Powell, J. concurring).
[3] See e.g. Reid v. Georgia, ___ U.S. ___, 100 S.Ct. 2752, 65 L.Ed.2d 840 (1980); United States v. Buenaventura-Ariza, 615 F.2d 37 (2d Cir.1980); United States v. Ballard, 573 F.2d 913 (5th Cir.1978); United States v. McCaleb, 552 F.2d 717 (6th Cir.1977); also see State v. Key, 375 So.2d 1354 (La. 1979); State v. Battleman, 374 So.2d 636 (Fla. 3d DCA 1979).
[4] See e.g. United States v. Smith, 574 F.2d 882 (6th Cir.1978); State v. Mitchell, 377 So.2d 1006 (Fla. 3d DCA 1979); also see Myles v. State, 374 So.2d 83 (Fla. 3d DCA 1979).
[5] Report of the Select Committee on Narcotics Abuse and Control, U.S. House of Representatives, 95th Congress (August 1978).
[6] Indeed, such a frisk would, in all likelihood, be unreasonable as at best the "drug courier profile" provides only reasonable suspicion that the person is carrying drugs, not that he is armed and dangerous. To constitutionally accomplish a weapons frisk, additional incriminating evidence apart from the profile, pointing to weapons possession would appear to be required to justify a frisk. See Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); State v. Lundy, 334 So.2d 671 (Fla. 4th DCA 1976).
[7] Report of Dade County Public Safety Department Organized Crime Unit, Airport Narcotics Unit, Statistical Report (1979).
[8] See e.g. United States v. Smith, 574 F.2d 882 (6th Cir.1978); United States v. McCaleb, 552 F.2d 717 (6th Cir.1977); State v. Mitchell, 377 So.2d 1006 (Fla. 3d DCA 1979).

Judge Carroll's opinion for the majority in the panel decision in this case presents the case for the "drug courier profile" as constituting probable cause for arrest or search as well as I have seen it presented. Royer v. State, 389 So.2d 1007 (Fla. 3d DCA 1979). Still, I remain unpersuaded by the legal analysis therein developed as, in my view, the profile, together with the law enforcement experience above discussed, is not sufficiently probative to justify a probable cause belief of criminal activity so as to authorize a full custodial arrest or search. At best, we deal with founded suspicion for a temporary stop. Moreover, I cannot agree that Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) or United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), hold that a "bootlegger profile" or a "drug courier profile" constitutes probable cause for an arrest or search.