374 So.2d 593 (1979)
The STATE of Florida, Appellant,
v.
Christopher R. FROST, Appellee.
No. 78-843.
District Court of Appeal of Florida, Third District.
August 14, 1979.
*595 Janet Reno, State's Atty., and Ira N. Loewy, Asst. State's Atty., for appellant.
Goodman, Dunberg & Hochman and Richard G. Dunberg, Miami, for appellee.
Before HENDRY, KEHOE and SCHWARTZ, JJ.
SCHWARTZ, Judge.
The state appeals from the suppression of the marijuana with the possession of which the defendant was charged. The primary issue is whether the trial court properly held that Frost had been unlawfully "seized" at the Miami International Airport before he purportedly consented to the search which led to the discovery of the contraband, or whether the police officers involved were at the time merely engaged in an approach to, or voluntary encounter with the defendant which did not involve his Fourth Amendment rights. We find that the ruling below was correct and affirm the order under review.
The incident in question occurred on November 28, 1977 while officers Johnson and Magdelena of the Public Safety Department's organized crime narcotics section were on duty at the airport. At about 4:15 P.M., they observed a man, who turned out to be Frost, rush up to the National Airlines ticket counter. Because he appeared to be nervous and in a hurry, and generally exhibited characteristics the officers considered to be indicative of a possible drug courier, they approached Frost as he left the counter. What followed was described by officer Johnson, who was the sole witness at the hearing on the motion to suppress:
A Yes, sir. After he left the ticket counter, my partner and I walked up to him and identified ourselves as narcotics investigators with the Sheriff's Office and asked him if he had time to talk to us, if he had a minute and when his flight was leaving.
And I again noticed that he became extremely jumpy and unusually jumpy and said that he had an hour before his flight yet, and said yes, he did have time to talk to us.
Q And what occurred then after you approached him?
A We asked him if he would show us some identification and if we could look at his airplane ticket. He produced a 
Q Did he comply?
A Yes, sir. He produced a California driver's license and a National  well, it was a Western Airlines ticket that had been changed to National Airlines.
Q Did you notice anything unusual about the names on both those items as presented to you?
A His driver's license was in the name of a Mr. Art Thompson  his airline ticket was in the name of Mr. Art Thompson, and his driver's license was in the name of Christopher Robert Frost.
Another item that strengthened our position is travel under an alias is also consistent with our pattern.
Q What did you do after receiving that information?
A We asked Mr. Frost why he was traveling under an alias and why he had come to Miami and so forth. He said he was visiting friends, that someone had made a reservation for him under *596 another name, and that was why the discrepancy in names.[1]
Q Did he at any time refuse to speak to you?
A No, he didn't.
Q Did he at any time attempt to walk away from you?
A No, sir.
Q Was he under arrest at that particular time?
A No, sir, he wasn't. We were out in the middle of the concourse in front of National Airlines in a public area.
Q What then occurred, if anything?
A We asked Mr. Frost if he would allow us to look in his briefcase, and he voluntarily consented for us to look into his briefcase.
Q What exactly did you ask him, to the best of your recollection?
A Well, I use the same phrase after having talked to a number of legal counsel on the point, because we're concerned. I said, `Mr. Frost, may I have permission to look in your briefcase?'
Q What was his exact response, to the best of your recollection?
A It was in the affirmative, and he himself opened the briefcase.
Inside the briefcase the officers found a small, misdemeanor, amount of marijuana and thereupon placed Frost under arrest for its possession. After that occurred, Frost gave another consent for the search of three bags which he had checked at the National counter. That luggage contained 88 pounds of cannabis which formed the basis of the felony charge below. The trial judge granted the defendant's motion to suppress all the marijuana in question. We affirm that order.
We consider that the crucial, in fact, the only question to be decided in this case is a very narrow one indeed; that is, the propriety of the trial court's implicit conclusion that Frost's liberty was restrained when he consented to the officers' search of his briefcase. Our discussion, then, perhaps best begins with an analysis of the reasons why this is the issue. Before the discovery of the cannabis in the briefcase, it is conceded by the state that the officers had neither probable cause to arrest Frost nor the "founded suspicion"[2] that he was involved in criminal activity which is necessary to make a Terry[3] investigative stop.[4] There was therefore no constitutional basis for any restriction of Frost's liberty as of that time. See Brown v. Texas, ___ U.S. ___, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); Dunaway v. New York, ___ U.S. ___, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). It is well settled that a "consent" given after a constitutionally impermissible restraint is presumptively tainted by that restraint and hence invalid; Pomerantz v. State, 372 So.2d 104 (Fla. 3d DCA 1979); Taylor v. State, 355 So.2d 180, 184 (Fla. 3d DCA 1978), cert. denied, 361 So.2d 835 (Fla. 1978); United States v. Ballard, 573 F.2d 913 (5th Cir.1978); and there is admittedly nothing in this record to overcome that presumption. Compare Husted v. State, 370 So.2d 853 (Fla. 3d DCA 1979). The arrest which was based upon the discovery of the marijuana in the briefcase  as well as the subsequent discovery of the larger quantity of cannabis which followed that *597 arrest[5]  may therefore be sustained only if the permission which was the basis for the search of the briefcase was itself valid; that consent may, in turn, be upheld only if Frost were not restrained by the officers when he gave it.
The state vigorously argues that the fact there was no lawful basis for "stopping" Frost is entirely immaterial because his freedom of movement was not, in legal effect, restricted by the officers in any way. It contends that, until he was arrested for the cannabis in the briefcase, Frost was entirely free simply to walk away from the officers and to decline either to speak with them or to accede to their requests. Thus, it is said, Frost's actions were the result only of his own voluntary decisions and did not at all involve the strictures of the Fourth Amendment against unreasonable searches and "seizures" by agents of the government. The legal basis of the state's contentions is found in the line of cases, exemplified by United States v. Wylie, 186 U.S.App.D.C. 231, 569 F.2d 62 (1977), cert. denied, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978), which hold that mere "contacts," "approaches" or "encounters" between officers and citizens which give rise to voluntary cooperation by the individual in question do not amount to Fourth Amendment seizures. See Terry v. Ohio, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We reject this argument simply because, whatever the pertinence of the doctrine to other fact patterns, it clearly does not apply to the one involved in this case. It is a totally unrealistic  and therefore totally unacceptable  view of Frost's actual situation to suggest that his consent was an entirely voluntary and cooperative one uninfluenced by a real and effective restraint placed upon him by the officers.
In resolving the difficult question of whether a particular case involves a nonforcible "stop" effected by an officer's show of authority, or a mere non-Fourth Amendment "contact," we find appropriate and adopt the test set forth in the Wylie case itself, at 569 F.2d 68:
[T]he crucial consideration is ... whether the person was `under a reasonable impression that he [was] not free to leave the officer's presence.' We would only add that in determining whether such a reasonable impression existed, the test must be `what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes.' Coates v. United States, supra 134 U.S.App.D.C. 97 at 99, 413 F.2d 371 at 373, quoting United States v. McKethan, 247 F. Supp. 324 (D.D.C. 1965), aff'd by order, No. 20,059 (D.C. Cir.1966).
In applying these standards to airport searches like the one involved in this case, many courts have held that a Fourth Amendment stop occurs as soon as officers initially approach an individual, identify themselves, and begin to question him. Thus, it is said in United States v. Coleman, 450 F. Supp. 433, 439 (E.D.Mich. 1978):
[T]he Court is satisfied that from the moment that Agent Markonni identified himself as a DEA Agent and began to ask defendant questions on the sidewalk outside the terminal, a Terry stop had been effected. True, defendant could have ignored the agent and refused to converse with him, but such conduct on Coleman's part would have been, at the very least, a breach of etiquette, an act of discourtesy and incivility which would not be expected of the ordinary, reasonable person innocent of crime. In the opinion of this Court, when an officer, upon a show of authority accosts a suspect and takes advantage of social pressures which inhibit the suspect from declining to deal with him, he restrains the suspect's liberty to the extent required to constitute a Terry stop.
*598 Accord: United States v. Chamblis, 425 F. Supp. 1330 (E.D.Mich. 1977); United States v. Dewberry, 425 F. Supp. 1336 (E.D. Mich. 1977); United States v. Westerbann-Martinez, 435 F. Supp. 690 (E.D.N.Y. 1977); see United States v. Rico, 594 F.2d 320, 323-327 (2d Cir.1979); United States v. Pope, 561 F.2d 663 (6th Cir.1977); United States v. McCaleb, 552 F.2d 717 (6th Cir.1977). We are attracted by the reasoning contained in these decisions, but we need not go nearly so far in resolving the problem presented in this case. This is so because Frost gave the crucial consent to search his briefcase at a time when the officers not only had approached and spoken to him but had also taken and retained possession of his airline ticket and driver's license. It seems obvious that any person in Frost's position  being questioned by narcotics officers who are holding both his identification and his means of departure  would have been, at the very least, "under [the] reasonable impression that he [was] not free to leave the officers' presence."[6] The state argues that even then Frost was in fact free to demand the return of his papers and then to walk away. But issues concerning governmental restraint of individual liberty are not to be resolved by determining what, after a close review of the applicable cases, a judge or a lawyer would know policemen are constitutionally authorized to do. Rather, they are dependent upon what an ordinary man, faced with a confrontation in the real world with persons who are asserting official authority, would reasonably believe that the officers can do. Dunaway v. New York, supra, ___ U.S. at ___, n. 6, 99 S.Ct. 2248, 60 L.Ed.2d at 832; United States v. Wylie, supra, 569 F.2d at 69, n. 7. On this basis and on this record, which must be viewed in the light most favorable to the decision below, State v. Nova, 361 So.2d 411 (Fla. 1978), we surely cannot interfere with the trial judge's holding that Frost had in fact been "seized" by the officers when he gave permission for them to look into his briefcase.[7] Since it is conceded that they had no constitutional basis for that seizure, this determination results in the conclusion that the consent *599 was invalid and that the motion to suppress was therefore properly granted.
Affirmed.
NOTES
[1] At the conclusion of the hearing, the prosecutor admitted that this was a "reasonable explanation" of the disparity in the names on the ticket and the driver's license.
[2] E.g., State v. Stevens, 354 So.2d 1244 (Fla. 4th DCA 1978).
[3] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[4] The state's position on this issue is founded upon the cases which correctly hold that the fact that a person exhibits the general characteristics and conduct relied upon by the officers in this case, and as outlined in a so-called "drug courier's profile," are not sufficient to create a reasonable basis for an investigative stop. E.g., United States v. Mendenhall, 596 F.2d 706 (6th Cir.1979); United States v. Smith, 574 F.2d 882 (6th Cir.1978); United States v. Ballard, 573 F.2d 913 (5th Cir.1978); United States v. McCaleb, 552 F.2d 717 (6th Cir.1977); see United States v. Rico, 594 F.2d 320 (2d Cir.1979). We agree with these decisions.
[5] It is clear that if the misdemeanor arrest were valid, the subsequent actions of the police officers, acting upon the later consent by a person thus deemed to have been properly arrested, were also valid.
[6] This conclusion is in accordance with the actual holding in the Wylie case. The court there determined that, while the officer's initial approach of the defendant did not constitute a "stop" (or at least that the trial judge could have so properly found), 569 F.2d at 68, a Fourth Amendment seizure did subsequently take place after Wylie had given the officer suspicious identification. In Wylie, however, it was held that the stop was justified by a "founded suspicion." In this case, it is admitted that none existed.
[7] The state relies very heavily upon the recently decided case of United States v. Elmore, 595 F.2d 1036 (5th Cir.1979) which indeed involves a factual picture very similar to this one. With all respect, however, we cannot, in both senses of the word, follow that decision. At some points in the Elmore opinion the court appears to uphold the finding of the district court that "the seizure did not occur until Agent Markonni removed Elmore's ticket from Elmore's immediate vicinity ..." 595 F.2d at 1039, 1042. To the extent that this statement indicates that it makes a constitutional difference as to the restraint of one's liberty whether an officer with a traveler's ticket in his hand remains face to face with the individual or walks away from him, we simply disagree with that conclusion.

Other language in the Elmore opinion, however, suggests that this was not really the holding of the court. At 595 F.2d 1040, it is stated that "[o]n all these facts ... the officers had a right to ask Elmore if he would consent to a search." If the court meant by this that the key issue was whether the defendant had been "seized" only when the officers asked for his permission to search, the Elmore decision is completely consistent with our holding. We must point out, however, that the facts which supported the officers' "founded suspicion" of Elmore and thus gave them the "right" to ask for permission to search, were all learned after they had taken the ticket from his presence, and thus after they had "stopped" him. Therefore, the decision seems to be contrary to the universal rule that the fruits of an unlawful search or seizure cannot retroactively serve to sustain it. E.g., Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927); Brown v. State, 62 So.2d 348 (Fla. 1952); United States v. Rico, supra, at 594 F.2d 323 ("... what developed from the investigative stop could not justify it.")
Finally, the Elmore decision, at most, merely upheld, as justified by the particular record below, a factual determination as to whether and when the defendant was "seized." We do the same here.