388 So.2d 286 (1980)
James Frank ROBINSON, Appellant,
v.
STATE of Florida, Appellee.
No. SS-99.
District Court of Appeal of Florida, First District.
September 10, 1980.
Rehearing Denied October 13, 1980.
*287 Donald G. Nichols, of Dawson, Galant, Maddox, Sulik & Nichols, Jacksonville, for appellant.
Jim Smith, Atty. Gen., Wallace Allbritton, Asst. Atty. Gen., Tallahassee, for appellee.
*288 SHIVERS, Judge.
Defendant appeals from an order denying his motion to suppress cocaine seized during an airport search, contending the evidence was the product of an unreasonable search and seizure and therefore inadmissible in evidence. We agree and reverse.
On May 16, 1979, defendant James Frank Robinson disembarked from a plane at the Jacksonville airport. As he was leaving the airport and preparing to get into a taxi, he was a stopped by Officer Anthony Hickson, a Sheriff's detective, who was working the airport narcotics detail that day. Officer Hickson identified himself, told Robinson he wanted to talk to him, and asked Robinson to step back inside the airport terminal. Once inside the terminal, Robinson was asked for some form of identification and his airline ticket. He presented a ticket in the name of "J. Smith" and his driver's license which was issued in his own name. After taking possession of Robinson's driver's license and airline ticket, Officer Hickson searched Robinson's luggage and found cocaine in a brown shaving kit. Officer Hickson testified that Robinson consented to the search. Robinson testified that he asked Officer Hickson for a search warrant and denied consenting to a search of his luggage. Upon finding cocaine, Hickson arrested Robinson, took him to an airport office, and searched the rest of his belongings, turning up more cocaine.
At the suppression hearing, Robinson contended Officer Hickson had neither probable cause nor a reasonable suspicion to justify the initial stop. Robinson further argued he did not consent to a search of his luggage, and, even if there was consent, such consent was tainted by the illegal stop and detention and therefore invalid. The State argued that Officer Hickson had a reasonable, articulable suspicion, based upon his observation of Robinson's behavior in light of the objective criteria of the "drug courier profile" analysis to support the initial stop.[1] The trial court, in denying Robinson's motion to suppress, ruled that there were "sufficient objective facts present to support the reasonable suspicion in the officer's mind that the present defendant was involved in possessing or transporting narcotics" and that defendant consented to a search.
Robinson was convicted for possession of cocaine upon his nolo contendere plea which was entered with the specific reservation that he could appeal to this court the trial court's denial of his pretrial motion to suppress.
The primary issue presented by this appeal is whether the investigatory stop of Robinson was based upon a well-founded, articulable suspicion that he was unlawfully carrying narcotics. In order to effect a lawful investigatory stop of an individual, police officers must have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity. Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); U.S. v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); State v. Frost, 374 So.2d 593 (Fla.3rd DCA 1979). The transcript of the suppression hearing reveals the following testimony by Officer Hickson on direct examination as to the grounds which he used to justify the initial stop of Robinson:
Q All right, sir. What did you do after you saw the Defendant, James Robinson?

*289 A I alerted Detective Higginbotham to observe Mr. Robinson. And I went downstairs, because I didn't want him to see me. And I went downstairs to the baggage area on the elevator while Detective Higginbotham followed him downstairs.
Q All right. What happened then?
A At that point he went to the luggage area where he picked up a suitcase.
Q And by "he," you mean the Defendant?
A Yes; Mr. Robinson.
Q What happened next?
A After he picked up the suitcase, he attempted to leave the airport. And at that point I advised Detective Higginbotham that we were going to stop Mr. Robinson.
Q All right. At that point, Detective Hickson, other than the prior arrest that you had had for narcotics on Mr. Robinson some two or three years ago, had you received any other knowledge with regard to Mr. Robinson?
A No.
Q Okay. What happened after you advised Detective Higginbotham that you were going to stop him?
A Mr. Robinson then went out the door and was walking toward the taxicab. And I walked up behind him and identified myself and advised him that we wanted to talk to him; would he come back inside into the airport.
Q All right, sir. Why did you stop him, Detective Hickson?
A Well, two reasons: Number One, he was coming from-on a flight from the West Coast, which is one of the flights that we normally watch-what we consider a target city where drugs come into Jacksonville from the West Coast. And, secondly, because of my personal knowledge of Mr. Robinson.
Later, on cross-examination, Officer Hickson testified:
Q Officer Hickson, this particular flight-you say that came in from the West Coast.
Isn't it true that the flight Mr. Robinson was on came from New Orleans?
A If I remember correctly, it made a stop in New Orleans. But the flight originated in the West Coast.
Q All right. Isn't it true that, actually, in New Orleans Mr. Robinson changed a different plane-on a different flight-to proceed on to Orlando and then on to Jacksonville? You checked that out, I guess?
A I think the itinerary on the ticket-J. Smith-it had the flight originated in San Francisco, I believe, to New Orleans to Orlando, I believe. And then it terminated here. So it's a continuing flight.
Q Okay. At the time that Mr. Robinson is coming down the concourse and going down the steps to get his luggage, walking out of the airport and headed toward the cab, you had no information as to where he was coming from; did you?
A The only thing I knew was that he had got off of the flight. And I didn't know which, you know, specific city he was coming from. But I know he got off of that flight.
Q You didn't know if he got off that flight in Orlando?
A At that point I didn't; no.
Q You didn't know if he got off in New Orleans or some other place at that point in time?
A At that point I didn't know; right.
Q All right, sir. And now isn't it true that about 1974 or '75 was the time that you had previously arrested Mr. Robinson, and that that particular case had been dismissed in court?
A I didn't remember the exact date. But, you know, I said two or three years.
But if it was '74, I guess that's when it was.
Q And since that period of time, you have not had occasion to arrest him for anything?
A No; I have not; no, sir.
Q And up until the time that you have arrested him for this particular charge on May 16, '79?

*290 A That's correct.
Q All right. When Mr. Robinson got off the plane and walked down to get his luggage, did you have any reason to believe he was armed?
A No; I did not.
Q Okay. Other than him being on this particular flight, and other than that you had in 1974 or '75-that area-previously had a case relative to him, did you have any reasonable suspicion whatsoever to believe he was violating the law in any way?
A No.
Q Okay. Those are the two things that you based your stopping him on. That is to say, he was on a particular flight, and that you had known him before?
A That's correct.
We conclude that Officer Hickson could not, as a matter of law, have reasonably suspected Robinson of criminal activity under these circumstances. The evidence shows that Officer Hickson stopped Robinson because he had disembarked from a flight which originated in a drug profile target city, but with several intervening stopovers, and because he recalled arresting Robinson several years earlier on a narcotics charge which was subsequently nolle prossed. Officer Hickson stated that he did not even know which city Robinson was coming from at the time of the initial stop. With the exception of Officer Hickson's knowledge of the previous arrest, there is nothing to distinguish Robinson's actions or conduct from that of the general public based upon these facts. See, Reid v. Georgia, ___ U.S. ___, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). Thus, the sole reason Officer Hickson initially stopped Robinson was based upon his prior arrest of Robinson.
Under the Fourth and Fourteenth Amendment, an individual's reasonable expectation of privacy is protected from arbitrary invasions solely at the unfettered discretion of police officers in the field. Brown v. Texas, supra; U.S. v. Brignoni-Ponce, supra; Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). We hold that an officer's knowledge of a suspect's previous arrest, standing alone, is insufficient to give rise to a reasonable suspicion that a crime may have been or is being committed in order to justify a lawful investigatory stop.
The legality of the initial stop is significant because any consent to search following an unconstitutional stop is presumptively tainted by the illegal stop and hence invalid. Norman v. State, 379 So.2d 643 (Fla. 1980); Taylor v. State, 355 So.2d 180 (Fla.3rd DCA 1978), cert. denied 361 So.2d 835 (Fla. 1978); State v. Frost, supra.
When trying to establish that there was a voluntary consent after an illegal stop, the government has a much heavier burden to carry than when the consent is given after a permissible stop. U.S. v. Ballard, 573 F.2d 913, 916 (5th Cir.1978); U.S. v. Troutman, 590 F.2d 604 (5th Cir.1979).
Under these circumstances, the burden is on the State to prove by "clear and convincing evidence" that the defendant freely and voluntarily consented to the search, Sagonias v. State, 89 So.2d 252 (Fla. 1956), so as to show a clear and unequivocal break in the chain of illegality sufficient to dissipate the taint of the prior illegal action. Norman v. State, supra; Taylor v. State, supra. "Ordinarily consent given after an illegal arrest will not lose its unconstitutional taint." Bailey v. State, 319 So.2d 22, 28 (Fla. 1975).
There is no easy definition of what constitutes a free and voluntary consent to search which is sufficient to escape the presumptive taint following an illegal stop. In each case, it must be determined from a "totality of the circumstances" as to whether the consent was in fact voluntarily given by the defendant or was the product of the illegal police action. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).
Based on the totality of the circumstances, the record in this case indicates the State has failed to show by clear and convincing evidence that Robinson's consent to search was free and voluntary. Robinson *291 testified that he did not consent to a search. He claims he asked Officer Hickson for a search warrant and was told his luggage would be searched whether or not he consented. Officer Hickson denied Robinson's testimony claiming he told Robinson he had a right to refuse a search, and that Robinson freely consented.[2] However, Officer Hickson's testimony is not completely consistent. On cross-examination, Officer Hickson testified:
Q All right. When you were asking him about searching, did he actually say, "Go ahead and search," or did he say nothing and throw up his hands?
A No. I think he said, "Yeah," or something like that.
Q You asked him, "Do you mind if I search," and he said, "Yeah"?
A Yes; that's correct.
Q Did you ask him anything else, or did you ask him more than once?
A No. I didn't ask him more than once.
Q Just one time?
A Yes.
Q Okay. He was not inviting the search, though. You were the one that wanted to search the thing; is that correct?
A That's correct.
Q All right, sir. And it was only after the search that you arrested him?
A That's correct.
Later, on redirect, Officer Hickson testified:
Q Detective Hickson, when you asked Mr. Robinson if you could search, was it your understanding that he consented?
A Was it my understanding that he consented?
Q Yes.
A Yes, it was.
Q Did he give you his consent to search is what I'm asking-
A Yes, he did.
Q -because I may have misunderstood.
But, as I understand it, Mr. Nichols asked you just a moment ago something to the effect, "Do you mind if I search," and the Defendant said, "Yeah," which, in my mind, indicated he might have minded.
Was that what you intended to say, or was it that he did not indicate permission to search?
A Well, when I answered his question, you know, this is the way he said it. You know, and he was-it was my understanding that he was giving me consent, because he really didn't say too many words the whole time. And that's just the way he was answering me.
Viewing the testimony above in the light most favorable to the State, we conclude that a doubt exists as to whether Officer Hickson was justified in his belief that Robinson consented to a search. If a doubt exists as to whether the officer was reasonable in concluding that a search was justified, such a doubt must be resolved in favor of the Defendant whose property was searched. Miller v. State, 137 So.2d 21, 25 (Fla.2nd DCA 1962); Taylor v. State, supra. It appears that Robinson did not invite or voluntarily consent to a search, but merely submitted to the apparent authority of a law enforcement officer. This conclusion is further supported by the fact that, at the time Robinson allegedly consented to the search, Officer Hickson was in possession of Robinson's driver's license and airline ticket. See, State v. Frost, supra. A distinction is recognized in the law between submission to the apparent authority of a law enforcement officer and unqualified consent. Mere acquiescence in a search is not necessarily a waiver of a valid search warrant. Rather for a person to waive his search and seizure rights, it must clearly appear that he voluntarily permitted or expressly invited and agreed to the search. Bailey v. State, 319 So.2d 22, 27 (Fla. 1975); Talavera v. State, 186 So.2d 811 (Fla.2nd DCA 1966); Taylor v. State, supra, at 183.
*292 Consequently, we determine that the initial stop of the defendant was not based on a reasonable suspicion of criminal activity. The subsequent search of the defendant's luggage was presumptively tainted by the impermissible stop. A serious doubt exists as to whether the defendant freely and voluntarily consented to the search, and the State failed to establish by clear and convincing evidence that defendant's consent to search was sufficiently voluntary so as to dissipate the taint of the illegal stop.
The trial court erred in denying defendant's motion to suppress the cocaine seized from the defendant's luggage because it was the fruit of an unreasonable search and seizure and was therefore inadmissible in evidence. Accordingly, the lower court's order denying defendant's motion to suppress and the resulting judgment and sentence is reversed, and the cause remanded to the trial court with directions to discharge the defendant.
MILLS, C.J., and LARRY G. SMITH, J., concur.
NOTES
[1] Officer Hickson defined the "drug courier profile" analysis at the suppression hearing as follows:

Q Detective Hickson, what do you mean specifically by a profile? Could you enlighten the Court?
A There are several that we use. First of all, we observe individuals that are acting-doing things out of the ordinary that an ordinary traveler would not do.
We observe people at the ticket counter that usually pay for tickets in large-with large amounts of money, or usually buy a one-way ticket. That's on outgoing flights.
On incoming flights we usually observe people that appear to act suspicious or may have-do things that ordinary people people don't do when they come in the airport.
And, well, we stop people-we look for certain things that individuals have on their possession, such as several identifications, maybe no identification at all, false I.D., and this type thing-that type of a person.
[2] The record reveals Officer Hickson did not attempt to have Robinson sign a "Consent to Search" form, apparently because of the presence of another officer. However, the other officer did not testify.