392 So.2d 1362 (1981)
STATE of Florida, Appellant,
v.
Donald Farrell GRANT, Appellee.
No. 80-422.
District Court of Appeal of Florida, Fourth District.
January 21, 1981.
Rehearing Denied February 25, 1981.
*1363 Jim Smith, Atty. Gen., Tallahassee, and Laura R. Morrison, Asst. Atty. Gen., West Palm Beach, for appellant.
Philip G. Butler, Jr., of Foley, Colton & Butler, P.A., West Palm Beach, for appellee.
DOWNEY, Judge.
The State of Florida appeals from an order suppressing evidence obtained during a search of appellee's luggage at the West Palm Beach Air Terminal. The only evidence adduced at the suppression hearing was the deposition of Deputy Sheriff Glover, who made the search and the arrest involved herein.
Glover's deposition reflects the following occurrences. Appellee Donald Farrell Grant entered the Delta Airlines terminal at the airport in West Palm Beach at approximately 6:00 p.m. Glover was on duty as a deputy sheriff employed by the Palm Beach County Sheriffs' Department working the airline terminal for narcotics couriers. Glover observed Grant enter the terminal, check his suitcase, and purchase a one way ticket to Chicago for cash. Glover noticed that Grant appeared very nervous, more so than most travelers. As Grant walked away from the ticket counter Glover approached him and said, "I'm with the Sheriff's office. Do you have a minute to talk to me?" Grant said, "Yes." Grant was nervous about his flight and said he did not want to miss his flight; Glover assured him he would not. Glover asked to see Grant's ticket, and Grant handed it to him. Then Glover asked if Grant would mind if Glover looked at some identification and Grant produced that. Grant appeared very nervous throughout. After examining the identification Glover inquired if Grant had any objection to Glover's looking through Grant's luggage. Grant advised he had no objection. He did say he was afraid he was going to miss his flight, but Glover told him not to worry; he would make the flight. Glover handed the ticket back to Grant and the two men returned to the ticket counter where Glover searched the suitcase and found 2 1/2 ounces of cocaine and two bottles of cutting agent. Glover then placed Grant under arrest.
It appears from the order under consideration that the state contended Glover had a well founded suspicion that Grant was involved in illegal activity, thus warranting the type of stop authorized by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, the circuit court found that the "drug courier profile" used by law enforcement officers engaged in narcotics investigations is not sufficiently reliable to justify a stop and that Glover had neither probable cause nor a well founded suspicion to stop Grant. Two of the cases relied upon by the court were State v. Battleman, 374 So.2d 636 (Fla. 3rd DCA 1979), and State v. Frost, 374 So.2d 593 (Fla. 3rd DCA 1979). The Frost case would be particularly persuasive in view of the careful analysis made of the various authorities on the subject were it not for the recent case of United States v. Mendenhall, 446 U.S. 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), which decision was not available to the trial judge when he entered the order in question.
Mendenhall, supra, is factually very similar to the case at bar. There Ms. Mendenhall had just arrived in Detroit District Metropolitan Airport on a flight from Los Angeles. As she disembarked the airplane she was observed by two Federal Drug Enforcement Administration agents who were *1364 present in the airport for the purpose of detecting the unlawful traffic of narcotics. The agents noticed that Mendenhall's conduct was characteristic of persons unlawfully carrying narcotics, so they approached her as she was walking through the concourse, identified themselves as federal agents, and asked to see her identification and airline ticket. Mendenhall produced an airline ticket and driver's license containing different names. When one of the agents identified himself as a narcotics agent, Mendenhall became quite shaken and extremely nervous. After returning the ticket to Mendenhall the agents asked if she would accompany them to the airport DEA office for further questioning, which she did. At the DEA office they asked if she would allow a search of her person and handbag. Although advised she had a right to decline, Mendenhall said, "Go ahead." Mendenhall also consented to a personal search by a policewoman, although again having been advised she could decline. Two packets of heroin were found in her undergarments and she was arrested.
The Federal District Court denied a motion to suppress and Ms. Mendenhall was convicted of drug offenses. On appeal the Circuit Court of Appeals, Sixth Circuit, reversed. In a plurality decision the Supreme Court of the United States reversed the Circuit Court of Appeals, ruling essentially, that the trial court's decision was correct. In discussing the factual setting, the Court stated that the Fourth Amendment requirement that all searches and seizures be founded on objective justification governs all seizures including those which involve only a brief detention short of an actual arrest. However, the Court noted that not all personal intercourse contact between the police and citizenry involves a seizure of the person. On this point two members of the Court stated:
We adhere to the view that a person is "seized" only when by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." United States v. Martinez-Fuerte, 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116. As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.
Moreover, characterizing every street encounter between a citizen and the police as a "seizure," while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices. The Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws. "Without such investigation, those who were innocent might be falsely accused, and those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. Haynes v. Washington, 373 U.S. 503, 515 [83 S.Ct. 1336, 1344, 10 L.Ed.2d 513]." Schneckloth v. Bustamonte, supra [412 U.S. 218] at 225, 93 S.Ct. [2041] at 2046 [36 L.Ed.2d 854].
We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.[6] Examples of circumstances that might indicate a seizure even where the person did not attempt to leave, would be the threatening presence of several officers, *1365 the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. See Terry v. Ohio, supra, 392 U.S., at 19, n. 16, 88 S.Ct., at 1879, n. 16; Dunaway v. New York, 442 U.S. 200, 207, and n. 6, 99 S.Ct. 2248, 2253, 60 L.Ed.2d 824; 3 LaFave, Search and Seizure 53-55 (1978). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law amount to a seizure of that person. 100 S.Ct. at 1877.
[6] We agree with The District Court that the subjective intention of the DEA agent in this case to detain the respondent, had she attempted to leave, is irrelevant except insofar as that may have been conveyed to the respondent.
Thus, two Justices ruled there was no seizure of Mendenhall by the DEA agents on the airport concourse. In addition, the search was found to be consensual.
While the five members of the Supreme Court concurred in the judgment of the Court to reverse the Court of Appeals and reinstate the ruling of the District Court, unfortunately all of the language used by the author of the plurality opinion was not endorsed even by those concurring in the judgment. However, we have quoted above at some length portions of the opinion on which two members of the Court agreed and which we believe are particularly relevant to this case and to our times. The courts must be vigilant in the protection of constitutional rights, but they must also recognize the present day problems of law enforcement, particularly in the narcotics field. In accommodating the tension between constitutional rights of the individual and the compelling interest of the public in detecting those trafficking in illegal drugs the courts should not create artificial barriers which hobble the efforts of law enforcement to stem the ever increasing tide of drug trafficking. As three of the justices observed in the Mendenhall case:
To meet this pressing concern, the Drug Enforcement Administration since 1974 has assigned highly skilled agents to the Detroit airport as part of a nationwide program to intercept drug couriers transporting narcotics between major drug sources and distribution centers in the United States. Federal agents have developed "drug courier profiles," that describe the characteristics generally associated with narcotics traffickers. For example, because the Drug Enforcement Administration believes that most drugs enter Detroit from one of four "source" cities (Los Angeles, San Diego, Miami, or New York), agents pay particular attention to passengers who arrive from those places. See United States v. Van Lewis, 409 F. Supp. 535, 538 (ED Mich. 1976), aff'd, 556 F.2d 385 (CA6 1977). During the first 18 months of the program, agents watching the Detroit airport searched 141 persons in 96 encounters. They found controlled substances in 77 of the encounters and arrested 122 persons. Id., at 539. When two of these agents stopped the respondent in February 1976, they were carrying out a highly specialized law enforcement operation designed to combat the serious societal threat posed by narcotics distribution. 100 S.Ct. at 1881.
In view of the foregoing, we hold that the contact made by Glover with Grant was not a seizure or a stop which would require either probable cause or a well grounded suspicion. Glover had the same right as any other citizen to approach Grant. He was not in uniform; he did not display a gun; he did not order Grant to comply with his requests. The tone of the entire approach appears to have been nonauthoritative and Glover's description of the incident is not patently incredible. Thus, the circuit court's decision has no support in the record when viewed in the light of Mendenhall. Had Grant testified and denied Glover's description of the incident the record may well have supported the findings and ruling of the trial court, and we would be bound thereby. However, as we pointed out initially, the only evidence adduced at the suppression hearing was Glover's deposition.
Accordingly, the order appealed from is reversed, and the cause is remanded for further proceedings.
REVERSED AND REMANDED with directions.
BERANEK and HURLEY, JJ., concur.