414 So.2d 611 (1982)
Barry SANDS, Appellant,
v.
The STATE of Florida, Appellee.
No. 79-2189.
District Court of Appeal of Florida, Third District.
June 1, 1982.
Mark Perlman, Fort Lauderdale, for appellant.
Jim Smith, Atty. Gen. and Theda James, Asst. Atty. Gen., for appellee.
Before HUBBART, C.J., and BARKDULL and DANIEL S. PEARSON, JJ.
HUBBART, Chief Judge.
The central question presented by this appeal is whether the warrantless search of the defendant's person by the police in this case constituted an unreasonable search and seizure in violation of the defendant's rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 12 of the Florida Constitution. For the reasons which follow, we conclude that the subject search and seizure was conducted incident to a valid arrest of the defendant and, therefore, did not constitute a violation of the defendant's search and seizure rights guaranteed by the above constitutional provisions. We, accordingly, affirm the judgment of conviction and sentence appealed from, as the trial court was eminently correct in denying the defendant's motion to suppress the fruits of the subject search and seizure.

I
The facts relevant to the above search and seizure issue are based entirely on the testimony of Officer William Johnson  the only witness who testified below at the *612 hearing on the defendant's motion to suppress. These facts are as follows.
On September 19, 1979, Officer Johnson was working at the Miami International Airport as part of the airport narcotics unit with his partner Officer Pearson. Officer Johnson had worked in this unit for a period of two years and received extensive training and experience with reference to the arrest of drug suspects; in particular, Officer Johnson was familiar and had worked extensively with the so-called "drug courier profile" with reference to the spotting and arresting of narcotic drug suspects.
On the above-stated date at approximately 4:40 p.m., Officer Johnson observed the defendant Barry Sands exiting a taxicab in front of the airport with one Gerald Russell. The defendant Sands was carrying a brown leather suit bag and a brown purse; his companion Russell carried a brown leather totebag. The two men entered the terminal near Concourse G and walked to the Continental Airlines ticket counter. On their way, both men appeared to the officer to be peering anxiously at all the persons around them.
Russell approached the Continental Airlines counter first, took out a large amount of cash from his pants pocket and requested tickets to Houston, Texas. In the midst of the transaction, Russell left the counter hurriedly and ran up the length of Concourse G to a men's room, leaving the defendant Sands to complete the purchase. Just as Sands was concluding the transaction for both of them, Russell returned to the ticket counter and received both tickets. No bags were checked.
Both men then proceeded toward Concourse G with Officers Johnson and Pearson following. At the juncture of Concourse G where it meets the main terminal, Officer Pearson approached Russell. Officer Pearson displayed his badge and identified himself as a police officer. At that point the defendant Sands, who was a foot ahead of Russell, turned in the direction of the two and walked rapidly away. Officer Johnson continued to observe as the defendant walked toward the Concourse G entrance, periodically looking back behind him at Russell and Officer Pearson. Suddenly, the defendant veered to his right and began walking away from the concourse, still looking back at Officer Pearson and Russell.
At that point, Officer Johnson approached the defendant, identified himself as a police officer and "asked him if he had a minute to talk." The defendant Sands at first did not appear to hear him  he was still preoccupied with Officer Pearson and Russell  and the officer repeated himself. The defendant Sands then replied, "yes, of course." Officer Johnson asked the defendant Sands for identification and the defendant produced a Houston driver's license in the name of "Barry Sands." This license remained in Officer Johnson's possession during the following questioning.
Officer Johnson asked the defendant if he was flying that day; the defendant said, "no." Officer Johnson then pointed out Russell to the defendant and asked the defendant if he knew him; the defendant again said, "no." Officer Johnson then indicated that he had seen the two exit the same taxicab and make a ticket purchase together. The defendant Sands immediately changed his story and began to tremble visibly and to sweat. Officer Johnson advised that he was concerned with narcotics passing through the airport, requested permission to search the defendant's suit bag, and advised that the defendant had a right to refuse the search; the defendant agreed to the search. Officer Johnson also asked for and received permission to search the defendant's purse. Prior to conducting any of these searches, however, Officer Johnson suggested that the two walk over some ten yards to where Officer Pearson and Mr. Russell were standing to see if Russell had the defendant Sands' airplane ticket. They thereupon walked over to this location where Officer Johnson found the defendant Sands' ticket under Mr. Russell's bag which was lying on a counter. Officer Johnson looked at it and thereafter handed both the ticket and the license back to the defendant Sands.
*613 Officer Johnson thereupon proceeded to search the defendant Sands' suit bag and purse, but found nothing incriminating. Officer Johnson then, testified as follows concerning what transpired thereafter:
"Q. What occurred then?
A. I asked Mr. Sands for permission to check his ankles.
Q. Why was that?
A. Because, based on my experience at the airport, it is a very popular place to carry reasonably large quantities of contraband.
Q. Had Mr. Sands' physical condition changed at all?
A. No, he was highly active, pacing back and forth and he continued to tremble. He appeared to be extremely nervous.
Q. How did you request permission to check Mr. Sands' ankles?
A. While I was kneeling down, when I finished looking through the bag, I said, `Can I look at your ankles?'
Q. Did Mr. Sands reply?
A. Yes. He said, `Really?'
I said `Really. A lot of people carry contraband on their ankles.'
Q. What did Mr. Sands say?
A. He said, `Well, let's go somewhere where it's more private.'
Q. Did he give you a reason why he wanted to go to somewhere where it was more private?
A. No.
Q. What occurred at the point where Mr. Sands suggested the move?
A. I suggested that we go in the men's room that was a few feet away from us.
Q. What occurred?
A. I stood up. I believe we folded his suit bag back up and he took a step towards the men's room and he stopped and turned around and looked at me and said, `Well, you might as well take me downtown and file your complaint.'
Q. What did you understand that to mean?
A. I took it to be an admission that he did, in fact, have contraband on his ankle.
Q. What did you do at that point?
A. I advised Sergeant Pearson that the subject had contraband on his ankles." [R. 58-60]
Officer Johnson immediately thereafter directed the defendant to go into the men's room where Officer Johnson frisked the defendant and discovered a quantity of cocaine being carried in a malleable lump on each one of the defendant Sands' ankles.
The defendant was subsequently charged by information with: (1) trafficking in a controlled substance [893.135, Fla. Stat. (1977)], and (2) possession of a controlled substance with intent to sell [§ 893.13, Fla. Stat. (1977)], in the Circuit Court for the Eleventh Judicial Circuit of Florida based on the above seizure of cocaine. The defendant moved pretrial to suppress the fruits of the subject search on the ground that said search was conducted in violation of the defendant's search and seizure rights guaranteed by the state and federal constitutions. The trial court heard and denied the motion to suppress. Thereafter the defendant entered a plea of nolo contendere to both charges, specifically reserving for appeal the denial of his motion to suppress.[1] The defendant was thereupon adjudged guilty as charged and was sentenced to two five-year concurrent sentences in the state penitentiary. The defendant appeals this judgment of conviction and sentence; we have jurisdiction to entertain this appeal. Art. V, § 4(b)(1), Fla. Const.; Brown v. State, 376 So.2d 382 (Fla. 1979); State v. Ashby, 245 So.2d 225 (Fla. 1971).

*614 II
The law is well-settled that a search and seizure conducted by state officials is presumptively unreasonable under the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 12 of the Florida Constitution when conducted without a search warrant, subject only to certain specifically established and well-delineated exceptions justified by absolute necessity. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Norman v. State, 379 So.2d 643 (Fla. 1980); Morales v. State, 407 So.2d 321 (Fla. 3d DCA 1981); Pomerantz v. State, 372 So.2d 104, 107 (Fla. 3d DCA 1979), cert. denied, 386 So.2d 642 (Fla. 1980). The state has the burden of proving that such an exception applies in a given case. Norman v. State, supra; Hornblower v. State, 351 So.2d 716 (Fla. 1977); Morales v. State, supra, at 327; Taylor v. State, 355 So.2d 180, 183 (Fla. 3d DCA), cert. denied, 361 So.2d 835 (Fla. 1978). One of the well-recognized exceptions to the search warrant requirement rule is that the police may conduct a warrantless search incident to effecting a lawful arrest of a person. Gustafson v. Florida, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973), affirming, State v. Gustafson, 258 So.2d 1 (Fla. 1972); United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973); Dixon v. State, 343 So.2d 1345, 1347 (Fla. 2d DCA 1977); § 905.21, Fla. Stat. (1981). Two requirements must necessarily be met before this exception is applicable in a given case: (1) the arrest of the said person must be lawful, and (2) the search must be properly incident to effecting that arrest. We turn now to a brief discussion of each of these two requirements.

A
"It is settled that in order to make a valid arrest [under the Fourth Amendment to the United States Constitution and Article I, Section 12 of the Florida Constitution] probable cause must exist prior thereto." D'Agostino v. State, 310 So.2d 12, 15 (Fla. 1975); see also Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); State v. Ramos, 378 So.2d 1294, 1297 (Fla. 3d DCA 1979). "Probable cause to arrest exists where a reasonable man, having the specialized training of a police officer, in reviewing facts known to the arresting officer prior to the actual time of arrest, would come to the conclusion that a felony is being or has been committed by the person to be arrested." Skelton v. State, 349 So.2d 193, 194 (Fla. 3d DCA 1977). Moreover, a police officer is authorized in Florida to make an arrest without an arrest warrant  save in the arrestee's home, see Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)  when the officer "reasonably believes that a felony has been or is being committed and reasonably believes that the person to be arrested has committed or is committing it." § 901.15(3), Fla. Stat. (1981).
The classic definition of probable cause, adopted by Florida courts,[2] is set forth by the United States Supreme Court in Brineger v. United States, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 1310-11, 93 L.Ed. 1879 (1949), as follows:
"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.
"The substance of all the definitions' of probable cause `is a reasonable ground for belief of guilt.' (citations omitted.) And this `means less than evidence which would justify condemnation' or conviction, as Marshall, Ch.J., said for the Court more than a century ago in Locke v. United States [7 Cranch. 339, 3 L.Ed. 364]... . Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where *615 `the facts and circumstances within their (the officers') knowledge, and of which they had reasonably trustworthy information, (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. (citation omitted).
These long prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law abiding citizens at the mercy of the officers' whim or caprice."
Moreover, the Florida Supreme Court has added in State v. Outten, 206 So.2d 392, 397 (Fla. 1968), as follows:
"The facts constituting probable cause need not meet the standard of conclusiveness and probability required of the circumstantial facts upon which conviction must be based. (citation omitted). The sufficiency of the officer's knowledge is not to be judged by an analysis of the effect of each isolated circumstance. Rather, it is to be measured by the test of what a reasonable man would have believed had he known all of the facts known by the officer. (citation omitted.) This rule of arrest is even more logical in this age of rapid transit, than it was in earlier years. Many criminals would be out of the jurisdiction and beyond apprehension before an arrest could be made if the officer were held to a stricter standard than that stated above. This standard strikes a balance between the public's right to have lawbreakers captured and the individual's right to be free from unreasonable detention." [emphasis added].

B
Given a valid arrest, a police officer is authorized to conduct a search incident to effecting that arrest. Gustafson v. Florida, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973), affirming, State v. Gustafson, 258 So.2d 1 (Fla. 1972); Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 365 (1969); § 905.21, Fla. Stat. (1977). This means that subsequent to such an arrest, "the police have an automatic right, without any further evidentiary showing, to conduct a full-blown search of the person arrested and the physical area into which he might reach in order to grab a weapon or destroy evidentiary items." State v. Ramos, 378 So.2d 1294, 1297 (Fla. 3d DCA 1979). "It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a `reasonable' search under that Amendment." United States v. Robinson, 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973).

III
Turning to the instant case, we have no trouble in concluding that the state established that the "search incident" exception was applicable to the warrantless search conducted herein. The arrest, when effected, was plainly based on probable cause and the search of the defendant's person was clearly incident to effecting that arrest.

A
The arrest, in this case, took place when the defendant was, in effect, ordered into the men's room by Officer Johnson after the defendant had stated, "Well, you might as well take me downtown and file your *616 complaint." Indeed, our decision in Royer v. State, 389 So.2d 1007, 1018 (Fla. 3d DCA) (en banc), pet. for review denied, 397 So.2d 779 (Fla. 1981), cert. granted, ___ U.S. ___, 102 S.Ct. 631, 70 L.Ed.2d 612 (1981), based on virtually identical facts, compels us to reach this conclusion. Prior thereto, however, the defendant's liberty was in no way restrained by the police; indeed, our decision in Login v. State, 394 So.2d 183 (Fla. 3d DCA 1981), based on strikingly similar facts, requires us to reach that conclusion. True, the defendant did give his plane ticket and driver's license to Officer Johnson, but, unlike State v. Frost, 374 So.2d 593 (Fla. 3d DCA 1979), both items were returned to the defendant so that his liberty cannot be said to have been restrained on that account; we reject the defendant's contrary contentions on this issue as unsupported by the existing case law. The arrest, in turn, of the defendant, when effected, was clearly a lawful one based on all the facts and circumstances of the case. We turn now to a review of those incriminating facts and circumstances.

1
First, the defendant's behavior prior to Officer Johnson's approach to the defendant in the airport fit, in part, a "drug courier profile" developed for use at major metropolitan airports by law enforcement agencies; indeed, this is what initially attracted Officer Johnson's attention to the defendant. According to Officer Johnson, the defendant's behavior, when considered as a whole, was suspiciously consistent with the behavior of many other drug couriers previously arrested during the officer's two years of work with the drug enforcement unit at the Miami International Airport. This behavior, briefly stated, was that the defendant: (a) arrived at the airport just before flight time and was extremely rushed, (b) appeared to be very nervous and was looking into the faces of everyone around him as he entered and moved through the airport, (c) was carrying light carry-on luggage, (d) purchased his place ticket in cash, rather than by check or credit card, (e) purchased a one-way plane ticket to Houston, Texas, a "target" city used by couriers for drug deliveries, and most importantly, (f) disassociated himself and his companion Russell when Officer Pearson began speaking to Russell and thereafter attempted to leave the airport. Although this informal "drug courier profile" behavior did not and could not constitute probable cause, in itself, for the defendant's arrest, Royer v. State, 389 So.2d at 1015-20, it was, when considered in totality, certainly suspicious behavior which warranted further scrutiny. See e.g., United States v. Mendenhall, 446 U.S. 544, 547, 100 S.Ct. 1870, 1873, 64 L.Ed.2d 497 (1980) (Powell, J., concurring); State v. Mitchell, 377 So.2d 1006 (Fla. 3d DCA 1979). It must, therefore, be considered part of the total, composite picture of probable cause which we examine in this case.

2
Secondly, the defendant's conduct during his conversation with Officer Johnson prior to arrest was equally suspicious. The defendant, at first, stated that he was not flying that day and was not acquainted with his companion Russell. When confronted with Officer Johnson's prior knowledge which indicated that these were false statements, the defendant changed his story while visibly shaking and sweating. This behavior, in our view, reasonably corroborated Officer Johnson's suspicion that he was dealing with a drug courier. Indeed, we are of the view that at this point there was a founded suspicion that the defendant was carrying contraband drugs which would have justified a temporary detention of the defendant, although such detention was not, in fact, effected in this case. See e.g., United States v. Smith, 574 F.2d 882 (6th Cir.1978); State v. Mitchell, 377 So.2d 1006 (Fla. 3d DCA 1979); Myles v. State, 374 So.2d 83 (Fla. 3d DCA 1979).

3
Finally, the defendant's statement to Officer Johnson which precipitated the arrest in this case was, without doubt, incriminating in nature. Officer Johnson had, quite properly, asked the defendant during the subject encounter for permission to search *617 the defendant's ankles stating, "a lot of people carry contraband on their ankles." The defendant responded that he wanted to go somewhere private and Officer Johnson suggested the nearby men's room. Whereupon the defendant folded up his suit bag, took one step toward the men's room, stopped, turned around, looked at Officer Johnson and said, "Well you might as well take me downtown and file your complaint." By this statement, the defendant was surely indicating, albeit indirectly, that he had contraband drugs on his ankles which Officer Johnson was about to discover, and that he was submitting to an arrest which he knew would inevitably follow; indeed, Officer Johnson, as well as the trial judge, interpreted the statement to mean, in effect, "You've got me." That inference, in our view, seems irresistible given the context in which it was made.
Moreover, we have no doubt that under the law the defendant's statement here was properly used against him. It was plainly a free and voluntary statement  indeed, a volunteered statement  made at a time when the defendant was entirely free to go his way with his airline ticket and luggage in hand. It was in no sense the product of illegal police coercion, threats, promises, or intimidation. Indeed, the entire subject of a possible arrest did not even come up in the conversation until the defendant mentioned it. Agreed, the defendant was, in fact, frightened during his encounter with Officer Johnson and no doubt believed that an arrest was imminent when he made his statement, but that was entirely due to his own consciousness of guilt and was in no way prompted by anything improper done by Officer Johnson.
Nor can the statement be excluded as being a crude assertion of constitutional rights for which, concededly, no incriminating inference could be drawn. The defendant by this statement was not daring Officer Johnson to arrest him or leave him alone, he was not refusing his consent to a police search of his person, he was not asserting any rights at all. Plainly and simply, he was acquiescing in an arrest which he saw as inevitable solely because of his own consciousness of guilt. As such, the statement was not an assertion of constitutional rights or a defiance to authority, crudely expressed, but an incriminating statement which Officer Johnson had a right to consider in determining whether to arrest the defendant.

4
Putting together, then the sum total of all of the above facts and circumstances presented to Officer Johnson at the point of arrest, we have no trouble in concluding that a reasonable man, having the specialized training of a police officer, would have concluded that the defendant was carrying contraband drugs; the subsequent arrest was, therefore, based on probable cause. The defendant fit, in part, the law enforcement "drug courier profile," displaying a total of six such characteristics of the profile; the defendant lied to Officer Johnson concerning his travel plans and association with his companion while visibly shaking and sweating; and, finally, the defendant made a highly suspicious statement to Officer Johnson pointing toward his present possession of contraband drugs. These facts, when considered as a whole, and not in isolation, gave Officer Johnson probable cause to arrest the defendant; indeed, we think the defendant's suspicious statement made just prior to the arrest tipped the scales from founded suspicion to probable cause and fully justified Officer Johnson's belief that the defendant was carrying contraband drugs.[3]

*618 B
Given a valid arrest of the defendant herein, we have no trouble in further concluding that the subsequent search of his person  which revealed the contraband cocaine  was clearly incident to effecting that arrest. As previously noted, searches of an arrestee's person, are, without exception, considered properly incident to effecting the arrest; indeed, the defendant has raised no contention to the contrary in either the trial court or this court. Accordingly, the subject search was plainly a reasonable one under the appropriate state and federal constitutional provisions as the search was conducted incident to effecting a valid arrest of the defendant.

IV
For the above stated reasons, the trial court was eminently correct in denying the defendant's motion to suppress in this cause. The judgment of conviction and sentence under review is, accordingly,
Affirmed.
DANIEL S. PEARSON, Judge, dissenting.
While I realize that, in some quarters, it is forcefully argued that telling a police officer that he cannot enter your home without a warrant is a circumstance which gives rise to a suspicion that the sought-after evidence is within, I believed, until today, that no court would announce that such a statement or, here, its counterpart, either by itself or when added to other "suspicious" circumstances, provides probable cause to search. I thought that the courts of this country were in complete agreement that because the lawful exercise of constitutional rights in the face of police authority comes from both the righteous and the wicked, that such exercise proves nothing at all.
Sands' words, "Well you might as well take me downtown and file your complaint,"[4] are quite simply the functional equivalent of "arrest me," or in other settings, "get a warrant," "get lost," or even more provocative challenges to authority. If these words are to be interpreted, as the majority says, "given the context," then I suggest that the context will nearly always be one in which the statement can be construed as evincing consciousness of guilt. Thus, the most unequivocal statement, "You cannot search my person," in the context of a previous consent to a search of luggage, could quite clearly be construed as indicating excessive and particular concern that a search of the person will turn up incriminating evidence and be, therefore, a circumstance to be viewed with suspicion. The context then will nearly always supply the ambiguity, and words which ostensibly rebuff a perceived unauthorized intrusion can nearly always be said to be an admission of guilt.
This is precisely the case before us. The trial court stated that "in light of all the circumstances, I am inclined to interpret that `you might as well take me down[town]' means it is an admission that you got me." It is evident in the record that the "circumstances" referred to are that since Sands previously consented to a search of his luggage and thereafter withheld his consent to a search of his person, his statement became an admission.
"THE COURT: There is no question about it in my mind. At that point, he had no right to stop the Defendant. He had no right to search the Defendant.
"He had every right to talk to the Defendant and the Defendant had a right to say, `I don't want to talk to you.' Now, what developed later when the Defendant had given his consent to the search of his luggage and then suddenly said, `Oh, well, you are not going to search my person, specifically as it relates to my ankles.'

*619 "Obviously wasn't there probable cause at that time? Wasn't that really an admission, `Look, I let you search, but I have nothing.' In this instance, at this point, no sir."
By affirming the trial court, the majority approves a rule of law that a constitutionally sanctioned challenge to authority, or, as the majority seems to prefer, acquiescence to arrest in the face of authority, given the proper (and, I suggest, not unusual) context, is an incriminating admission.[5]
Here, despite the majority's omniscient hindsight,[6] the statement by Sands no more clearly signified Sands' guilt than it signified the exercise of his constitutional right to be searched incident to a lawful arrest. In my view, the correct rule of law is that only a clear and unequivocal incriminating statement  looking to the words alone[7]  can be a circumstance used in determining the existence of probable cause.[8] This view is hardly novel. Indeed, I thought that the issue in the present case had been settled long ago by Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), which flatly rejected the notion that "a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct which the arresting officers themselves have provoked." 371 U.S. at 484, 83 S.Ct. at 415.
I have a still greater concern about the majority opinion. The majority implicitly concedes that the search was conducted without the defendant's voluntary consent. They do this quite obviously because the defendant's "ambiguous" statement did not provide the necessary clear and convincing evidence of consent. But the majority takes that very same statement and uses it as the last straw for probable cause. By this process of converting non-consent into a factor for probable cause, the majority obviates the need for the defendant's consent to search where probable cause is lacking. If refusal to consent  unequivocal or ambiguous  is, viewed in context, suspicious and can provide probable cause, then an officer who has less than probable cause need only ask for permission to search, and no matter what the answer, proceed to search. Although likely unintended, this is the pernicious outcome of the majority opinion.
I dissent.
NOTES
[1] The defendant also reserved the right to appeal the denial of his motion to dismiss the information. There is admittedly no merit to this position in view of the Supreme Court's subsequently decided case of State v. Benitez, 395 So.2d 514 (Fla. 1981). We, accordingly, reject the defendant's contention on this appeal that Section 893.135, Florida Statutes (1977) is unconstitutional.
[2] See e.g., McCain v. State, 151 So.2d 841 (Fla. 2d DCA), cert. denied, 157 So.2d 817 (Fla. 1963); Gispert v. State, 118 So.2d 596, 598 (Fla. 2d DCA), cert. denied, 122 So.2d 782 (Fla. 1960).
[3] See e.g., United States v. Wilkes, 451 F.2d 938, 941 (2d Cir.1971) (overheard remark that, "I don't sell bundles at a discount," by defendant went a long way to establishing probable cause for arrest of suspected drug dealer); State v. Durham, 108 Ariz. 233, 495 P.2d 463, 465 (Ariz. 1972) (en banc) (defendant's statement, "I am not dealing, I only have enough for my own use," to undercover police officer held sufficient probable cause for arrest); People v. Taylor, 46 Cal. App.3d 513, 120 Cal. Rptr. 762, 769-80 (1975) (factor in finding probable cause for arrest for burglary was defendant's statement to police after being stopped in car, "How did you know it was me?").
[4] On cross-examination, the officer stated that he could not remember the exact words and that Sands might have said, "If you want to search my ankles, you might as well take me downtown and file your complaint." Under the majority's analysis, this difference in the language used would make no difference in the result it reaches.
[5] In Goldberg v. State, 407 So.2d 352 (Fla. 4th DCA 1981), during a consensual search of the defendant's luggage, the defendant objected  "Hey, that is my personal stuff"  when the officer pulled a package from a shirt pocket within the luggage. The appellate court found this to be a withdrawal of consent and held the continuing search and seizure of the package unlawful. I assume the majority in the present case would, given the context, view the defendant's statement as an admission supplying probable cause.
[6] The majority, knowing that drugs were found on the defendant's person, confidently asserts that the statement arose from the defendant's consciousness of guilt. Thus, his statement is said to be incriminating "without doubt," "surely indicating" that he possessed contraband, and "irresistibly" meaning that "you've got me." I had always thought that since a search is not justified by what it turns up, neither is an arrest.
[7] To the extent that the statement is in response to a question, and without the question is meaningless, then one may look to the question and, in that limited sense, the "context." If this were the majority's view of "context," I would have no quarrel with it.
[8] Compare Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (Burton, J., concurring) (defendant's answer, "Not too much," to question, "How much liquor have you got in the car?" was an admission that he was transporting some liquor, providing probable cause for arrest) with Pigg v. United States, 337 F.2d 302 (8th Cir.1964) (defendant's statement, "I wouldn't doubt it," in response to officer's statement, "I bet you stole it" [referring to a box of merchandise in defendant's hand], not an admission so as to supply probable cause for defendant's arrest). Each of the statements made in the cases cited by the majority in n. 3, supra, is, on its face, incriminating.